IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

KEVIN PLANTAN,

      **Plaintiff,**

    **v.**
                                       Civil Action No. 3:22cv407

KELLY SMITH, *et al.*,

      **Defendants.**

## MEMORANDUM OPINION
*Motion to Exclude*

This matter comes before the Court on Defendants Cornerstone Therapy Associates, LLC ("Cornerstone") and Wendy Atkinson's (collectively, the "Cornerstone Defendants") January 5, 2024 Motion to Exclude Opinions of James Todd, Ph.D. (the "Motion to Exclude" or the "Motion"). (ECF No. 74.) On January 12, 2024, Plaintiff Kevin Plantan filed a Response in Opposition to Cornerstone Defendants' Motion to Exclude Expert Witness. (ECF No. 83.) On January 16, 2024, the Cornerstone Defendants filed a Brief in Reply to Plaintiff's Opposition Regarding Motion to Exclude Opinions of James Todd, Ph.D. (ECF No. 87.)

The Cornerstone Defendants also filed a Motion for Hearing on the Motion to Exclude, (ECF No. 76), and on February 8, 2024, the Court scheduled oral argument on the Motion to Exclude as well as on contemporaneously filed Motions for Summary Judgment, (ECF Nos. 77, 79). (ECF No. 96.) On April 5, 2024, the Court heard argument on, *inter alia*, the Motion to Exclude, (ECF No. 74). (ECF No. 100.) This matter is accordingly ripe for disposition.

For the reasons articulated below, the Court will grant the Motion. (ECF No. 74.)

## I.  Factual and Procedural Background

Detailed summaries of the facts of this case appear in previously issued opinions, (ECF Nos. 40, 42), and the Court presumes familiarity with those facts.  In short, this action arises from the arrest and subsequent detention of Kevin Plantan based on allegations that he sexually molested his minor daughter, S.P.  (ECF No. 1 ¶¶ 38–71.)  Mr. Plantan maintains his innocence.  (*See generally* ECF No. 1.)  The Court limits its recounting of the factual and procedural background to that information relevant to deciding the Motion to Exclude currently before the Court.  (ECF No. 74.)

### A.    Factual Background

Mr. Plantan and Defendant Kelly Smith married in 2001.  (ECF No. 1 ¶ 16.)  Mr. Plantan and Ms. Smith separated in 2010 and finalized their divorce in 2011.  (ECF No. 78, at 2.)  The couple's only child, S.P., was diagnosed as a young child with "regressive autism" and "severe dyspraxia, a motor-function disorder that severely limits, alters, and impacts her ability to control her own physical movements."  (ECF No. 1 ¶¶ 19–20.)  At some point between ages two-and-a-half and six (the parties dispute the exact age),[1] S.P. became nonverbal, a condition which persists to this day.  (ECF No. 1 ¶ 21; ECF No. 78, at 2.)

---

[1] Ms. Smith avers in a sworn affidavit that "[o]n July 31, 2013, S.P., then 6 years of age, had an abrupt and unexplained loss of speech which has persisted to this day."  (ECF No. 78, at 2.)  Mr. Plantan, in contrast, alleges in his unverified Complaint that "[a]t approximately two and a half years old, S.P. became nonverbal."  (ECF No. 1 ¶ 21.)  The precise age at which S.P. became nonverbal is immaterial, because the causes of action underlying this litigation challenge only the reasonableness of Ms. Smith's belief in the typed communications, and no party argues that the age at which S.P. became nonverbal impacts the reasonableness of Ms. Smith's belief.

2

The record establishes that Defendant Wendy Atkinson, an occupational therapist and the owner of Cornerstone, began working with S.P. in 2011.[2] (ECF No. 1 ¶¶ 34–35; ECF No. 78, at 4; ECF No. 80, at 5.) Ms. Atkinson works with S.P. on, *inter alia*, "develop[ing] her motor skills" so that S.P. can learn to "type independently." (ECF No. 83-1, at 67, 78 (Atkinson Depo. Tr., at 66:18–22; 77:5–21).) The Cornerstone Defendants characterize the assistance S.P. receives as "light support to her wrist or elbow on a regular iPad . . . with a regular keyboard" and aver that "[w]hen S.P. types, S.P.'s fingers are the only fingers that touch the keyboard. Wendy Atkinson never directs S.P.'s fingers." (ECF No. 80 ¶¶ 30, 32.)

Mr. Plantan, in contrast, characterizes the assistance S.P. receives as "'facilitated communication.'" (ECF No. 1 ¶ 24.) Mr. Plantan describes facilitated communication as a "technique" that "involves the purported speaker . . . pointing to individual letters on a board via assistance of another individuals . . . as a means of spelling individual words" while the "facilitator offers support via physical and verbal prompts," including "the physical touching and placing of the speaker's fingers on the relevant letters." (ECF No. 1 ¶¶ 25–26.) Mr. Plantan further asserts that facilitated communication is "a disproven, controversial, nonscientific, unaccepted, and unrecognized practice" that "does not involve reliable or credible communication with those suffering from nonverbal autism." (ECF No. 1 ¶ 29.)

---

[2] The parties dispute the date. In his unverified Complaint, Mr. Plantan alleges that in 2019, Ms. Smith hired the Cornerstone Defendants to begin using "a form of facilitated communication with S.P. to assist her with virtual learning among other things." (ECF No. 1 ¶ 34.) In a sworn declaration, Ms. Atkinson avers that she has been working with S.P. since S.P. was four years old, which implies that Ms. Atkinson began working with S.P. in or about 2011. (Atkinson Decl. ¶ 5.) Ms. Smith likewise represents, in a sworn affidavit, that Ms. Atkinson began providing S.P. occupational therapy services in 2011. (Smith Aff. ¶ 32.) To identify a genuine dispute at the summary judgment stage, Mr. Plantan must support his position with "*admissible* evidence," *see Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). He has not done so here.

On December 15, 2020, S.P. "was participating in her seventh-grade online classes . . . with one of her care attendants." (ECF No. 78, at 6–7.) The attendant, Ms. Olivia Mastrangeli,[3] interrupted a Zoom meeting, "showed [Ms.] Smith S.P.'s iPad[,] and told her that S.P. had typed what was on the screen with [Ms. Mastrangeli] providing wrist support." (ECF No. 78, at 7.) The screen contained allegations that Mr. Plantan had sexually abused S.P. (ECF No. 78, at 7–8.) After consulting with S.P.'s guardian *ad litem*, Virginia Podboy, Ms. Smith "called the non-emergency telephone number for the Hanover County Sheriff's Department and reported what had occurred." (ECF No. 78, at 9.)

After an investigation into the reported abuse, on January 9, 2021, Mr. Plantan was arrested by the Hanover County Sheriff's Department, indicted on charges of rape and sodomy, and held in jail for nearly ten months until his release on November 5, 2021. (*See* ECF No. 1 ¶¶ 41–52, 60.)

On April 8, 2021, S.P. testified at a preliminary hearing with the assistance of Ms. Mastrangeli. (ECF No. 78, at 13 (citing ECF No. 75-4).) The Hanover Juvenile and Domestic Relations District Court "found that S.P. was competent and that the use of physically[ ]aided communication in that case was 'proper, appropriate, reliable[,] and credible.'" (ECF No. 78, at 13 (quoting ECF No. 75-4, at 2).) Ms. Atkinson also testified at Mr. Plantan's preliminary

---

[3] Ms. Mastrangeli was originally named as a defendant in this action but, upon motion by Mr. Plantan, has been dismissed. (*See* ECF Nos. 1, 25–26.) Ms. Smith hired Ms. Mastrangeli and Ms. Danielle Whitlow as in-home respite care providers to assist with S.P.'s virtual schooling needs. (ECF No. 80-1 (hereinafter "Atkinson Decl.") ¶¶ 10, 12.) Ms. Mastrangeli served as an independent contractor with Cornerstone in December 2020 but all her work with S.P. occurred under direct employment by Ms. Smith, not Cornerstone. (Atkinson Decl. ¶¶ 9–10.) As described in detail in the forthcoming summary judgment decision, Mr. Plantan presents no admissible evidence that Ms. Mastrangeli was working for, or as an agent of, Cornerstone at the time of these events. *See* note 14, *infra*.

hearing in the Hanover Juvenile and Domestic Relations District Court about her work with S.P. (ECF No. 1 ¶ 59; ECF No. 83-1, at 63:19–22.)  Based on the testimony, the court certified the charges against Mr. Plantan to the grand jury.  (ECF No. 1 ¶ 59.)

On October 19, 2021, the Hanover County Circuit Court judge "ordered a 'double blind' test . . . as a means of determining the validity and credibility of the . . . communication at issue." (ECF No. 1 ¶ 63.)  Ms. Smith initially agreed to this double-blind test of S.P.'s communications, but on November 11, 2021, Ms. Smith informed the Hanover County Commonwealth Attorney's Office that she would not permit S.P. to participate in the court-ordered evaluation.  (ECF No. 1 ¶ 67.)  The Commonwealth subsequently dismissed all charges against Mr. Plantan on November 23, 2021.  (ECF No. 1 ¶ 71.)

### B.   Procedural Background

On June 1, 2022, Mr. Plantan filed suit in this Court against Ms. Smith; the Hanover County Sheriff's Office and one of its sergeants; Hanover County Department of Social Services and two of its social workers; Defendants Cornerstone and Wendy Atkinson, an occupational therapist and the owner of Cornerstone; and two other occupational therapists / aides (including Ms. Mastrangeli) who worked with S.P.  (*See generally* ECF No. 1.)  It was Ms. Mastrangeli to whom she allegedly reported the abuse.  (ECF No. 78-1 ¶¶ 58–67; ECF No. 78-3 ¶¶ 5, 10–24; ECF No. 78-8, at 50 (Atkinson Depo. Tr., at 49:11–19); ECF No. 84, at 37–38 (Smith Depo. Tr., at 36:25–37:1).)  The Court has dismissed from this action all defendants but Ms. Smith and the Cornerstone Defendants.  (*See* ECF Nos. 26, 32, 41.)[4]  Only the malicious prosecution claim

---

[4] Mr. Plantan initially sued Ms. Smith and the Cornerstone Defendants, among others, for malicious prosecution (Count 3) and false arrest (Count 4).  (ECF No. 1 ¶¶ 85–112.)  Mr. Plantan also sued Ms. Smith for intentional infliction of emotional distress ("IIED") (Count 5) and abuse of process (Count 6).  (ECF No. 1 ¶¶ 113–130.)  Additionally, Mr. Plantan sued the Cornerstone

(Count 3) and the IIED claim (Count 5) remain against Ms. Smith.  (ECF Nos. 41, 43.)
Separately, only a single count for malicious prosecution (Count 3) remains against the
Cornerstone Defendants.  (ECF No. 41.)

Regarding the malicious prosecution claims, Mr. Plantan asserts that the Cornerstone
Defendants "acted in concert" with Ms. Smith "to intentionally report the purported allegations
made by S.P. to . . . law enforcement agents[.]"  (ECF No. 1 ¶ 91.)  He further alleges that Ms.
Smith knew or should have known "that facilitated communication was not recognized as a
legitimate practice" and that any information communicated through the practice "was not
credible."  (ECF No. 1 ¶¶ 100–01.)  Regarding the IIED claim, Mr. Plantan contends that Ms.
Smith's "procurement of facilitated communication for S.P. after knowing it relied on
unacceptable or unrecognized procedures, and the subsequent reliance on such procedures when
making reports to law enforcement, was intentional or reckless" and subjected Mr. Plantan to
physical harm.  (ECF No. 1 ¶¶ 114, 119.)  Thus, the legitimacy of the method of communication
by which the allegation of abuse was typed—including whether such method constituted
facilitated communication—undergirds both remaining counts.

## C.    Plaintiff's Expert Disclosure and the Motion to Exclude

On October 23, 2023, pursuant to the Court's Amended Initial Pretrial Order, (ECF
No. 50), Mr. Plantan submitted his Disclosures of Experts, (ECF No. 57), attaching the Report of
James Todd as Expert Witness. (ECF No. 57-1).  That motion has been fully briefed and the
Court heard oral argument on April 5, 2024.

---

Defendants, among others, for gross negligence (Count 7).  (ECF No. 1 ¶¶ 131–173.)  The Court
previously dismissed Counts 4 and 6 against Ms. Smith, (ECF No. 43, at 1), and Counts 4 and 7
against the Cornerstone Defendants, (ECF No. 41, at 1).

In the Motion to Exclude, the Cornerstone Defendants seek to exclude the opinions of

Mr. Plantan's expert, Dr. James Todd, Ph.D. (ECF No. 74, at 1.) Dr. Todd anticipates that he

would opine "that facilitated communication ('FC') has never been shown to produce reliable

communication from the subject it is used on and that the messages have been shown to actually

be authored by the facilitator." (ECF No. 57-1, at 1.) Dr. Todd would also opine that Ms.

Atkinson "has recklessly disregarded the clear and overwhelming conclusions of the scientific

community that facilitated communication is ineffective and dangerous." (ECF No. 57-1, at 2.)

## II.  Standards of Review

### A.  Federal Rule of Evidence 702[5]

"Expert testimony in the federal courts is governed by Federal Rule of Evidence 702." *In*

*re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Products Liability Litigation*

---

[5] Mr. Plantan argues that some "changes to Rule 702 went into effect after the disclosure of Dr. Todd's report, and any argument that such report does not satisfy the amended rule should not govern," but that "[n]evertheless, his testimony will satisfy Rule 702 in its current and prior form." (ECF No. 83, at 2.)

The Court assesses Dr. Todd's report under the amended Rule 702. Because the amendment does not effect a substantive change in the Court's analysis and because Mr. Plantan had six months' notice about amended Rule 702, application of the amended Rule 702 is proper.

First and most importantly, the 2023 Advisory Committee Notes to Rule 702 explain that the amendment does not effect a substantive change to Rule 702, but rather clarifies that the preponderance standard applies to evaluating the qualification of an expert witness. *See* Fed. R. Evid. 702 advisory committee's notes to 2023 amendments. The Advisory Committee emphasizes that Fed. R. Evid. 104(a) governs the admissibility of the reliability requirements in Rule 702. *See id.* Courts had improperly been evaluating those requirements as going to the weight of the evidence, not their admissibility, which had the effect of discounting the courts' role as gatekeepers of such testimony. *See id.*

Second, notice of the amended rule had long been in effect when Dr. Todd filed his report. On April 24, 2023, United States Supreme Court Chief Justice John Roberts announced the latest amendments to Rule 702. Letters from John G. Roberts, Jr., Chief Justice, U.S., to Kevin McCarthy, Speaker, U.S. H. of Rep., and Kamala Harris, President, U.S. Senate (the

*(No II) MDL 2502*, 892 F.3d 624, 631 (4th Cir. 2018). "Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all [expert] testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. Ltd. v. Carmichael ("Kumho Tire")*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) (second alteration in original)).

Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and[,]

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Expert testimony is admissible under Rule 702, then, if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the [finder of fact] to understand or resolve a fact at issue." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th

---

"April 24, 2023 Roberts Letter") (Apr. 24, 2023), https://www.supremecourt.gov/orders/courtorders/frev23_5468.pdf (last accessed March 19, 2024). This announcement declared that the amendments "shall take effect on December 1, 2023, and shall govern in all proceedings thereafter commenced, *and, insofar as just and practicable, all proceedings then pending*." *Id.* at 3 (emphasis added).

It is "just and practicable" to apply the amended Rule 702 here. *See* April 24, 2023 Roberts Letter, at 3. Mr. Plantan was on notice from April 24, 2023 that the rule would govern pending cases. He did not file Dr. Todd's expert report until nearly six months later, on October 23, 2023. (*See* ECF No. 57.)

Cir. 1999) (citing *Daubert*, 509 U.S. at 592). "The first prong of th[e] inquiry necessitates an examination of whether the reasoning or methodology underlying the expert's proffered opinion is reliable," and the second prong "requires an analysis of whether the opinion is relevant to the facts at issue." *Id.*

In determining whether proffered expert testimony is sufficiently reliable so as to assist the trier of fact, *Daubert* suggests that courts consider several non-dispositive factors: (1) whether the expert's methodology can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and, (4) whether the theory or technique has gained general acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 593–94. This analysis applies to all proffered specialized knowledge, not solely scientific expert testimony. *Kumho Tire*, 526 U.S. at 141. Despite these factors, "[t]he inquiry to be undertaken by the district court is 'a flexible one' focusing on the 'principles and methodology' employed by the expert, not on the conclusions reached." *Westberry*, 178 F.3d at 261 (quoting *Daubert*, 509 U.S. at 594–95).

A district court "need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct. As with all other admissible evidence, expert testimony is subject to being tested by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id.* at 261 (quoting *Daubert*, 509 U.S. at 596) (alteration in original) (internal citation omitted). "[T]he court should be mindful that Rule 702 was intended to liberalize the introduction of relevant expert evidence." *Id.* (citing *Cavallo v. Star Enter.*, 100 F.3d 1150, 1158–59 (4th Cir. 1996)).

The proponent of expert testimony bears the burden of proof in establishing its admissibility. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) ("The proponent of [expert] testimony must establish its admissibility by a preponderance of proof.").

## III. Analysis

In the Motion to Exclude, the Cornerstone Defendants argue that "Dr. Todd's opinions are inadmissible for numerous reasons," including that (1) "he lacks the foundational knowledge, skill, experience, training, or education required"; (2) "the opinions offered are essentially an improper attack on the credibility of [Ms.] Atkinson"; (3) Dr. Todd's opinions "venture into territory that is off limits to experts"; (4) "Dr. Todd's opinions fail to 'help' the jury decide any issue of fact in dispute"; (5) his opinions "have not been validly applied to the actual facts in this

case, and thus, are unreliable under Rule 402;"[6] and (6) the opinions' minimal probative value is "outweighed by their significant prejudicial effect under Rule 403."[7]  (ECF No. 75, at 3–4.)

Failure to meet any one of the prongs of Rule 702 results in the inadmissibility of the expert testimony.  In the interest of creating a full record, the Court evaluates every prong. Because Dr. Todd fails to meet three of the four qualifications to testify as an expert on these matters as set forth in Rule 702, the Court will, in its role as gatekeeper, grant the Motion to Exclude.  (ECF No. 74.)

## A.    Dr. Todd's Background and Proffered Testimony

Dr. James Todd is a "professor of Psychology at Eastern Michigan University" and teaches courses on "experimental methodology and basic behavioral principles, including stimulus control and prompting."  (ECF No. 57-1, at 7.)  Dr. Todd earned a Ph.D. in

---

[6] Federal Rule of Evidence 402 states:

Relevant evidence is admissible unless any of the following provides otherwise:

- the United States Constitution;
- a federal statute;
- these rules; or
- other rules prescribed by the Supreme Court.

Irrelevant evidence is not admissible.

Fed. R. Evid. 402.

[7] Federal Rule of Evidence 403 states:

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403.

Developmental and Child Psychology and a Master's Degree in Human Development. (ECF No. 57-1, at 7.)[8] His training and experience include "severe, multiple handicaps, including autism." (ECF No. 57-1, at 7.) He has "formally studied facilitated communication and variants of it since about 1991," including "attending several trainings and didactic workshops and information sessions about facilitated communication given by top authorities in the . . . field." (ECF No. 57-1, at 7–8.) Dr. Todd has "authored or co-authored several articles and chapters" on facilitated communication. (ECF No. 57-1, at 8.)

Dr. Todd's written report indicates that he "would opine, based on the available scientific evidence . . . that facilitated communication . . . has never been shown to produce reliable communication from the subject it is used on and that the messages have been shown to actually be authored by the facilitator." (ECF No. 57-1, at 1.) Further, based on a review of Ms. Atkinson's September 28, 2023 deposition testimony (but not her second day of testimony on October 16, 2023), (ECF No. 59, at 2), Dr. Todd "would also say that it appears that [Ms. Atkinson] . . . has recklessly disregarded the clear and overwhelming conclusions of the scientific community that facilitated communication is ineffective and dangerous, and proceeded to use it anyway." (ECF No. 57-1, at 2.)

In his opposition to the Motion to Exclude, Mr. Plantan states that Dr. Todd "will testify that, based on his expertise, research, and experience, the methods employed by the [Cornerstone] Defendants. . . maintain the same material variables as forms of 'facilitated communication' that have been discredited for the purpose of evaluating the substance of words,

---

[8] Dr. Todd's report is also located at ECF No. 75-2. For uniformity, the Court cites to ECF No. 57-1 throughout.

12

sentences, or other expressions produced by the patient or client as the purported author or speaker." (ECF No. 83, at 3–4.)

**B.     Dr. Todd's Testimony Does Not Meet the Requirements of Rule 702**

Dr. Todd offers extensive analysis and expertise regarding facilitated communication, specifically that he and many others have concluded after rigorous scientific study that facilitated communication is illegitimate. This testimony *could* be admissible.

As explained below, however, Dr. Todd's proposed testimony suffers from at least two fatal flaws: First, he had no direct observation or interaction with Ms. Atkinson[9] or S.P. before he reached his conclusions. Second, despite identifying several objective means to evaluate the accuracy of the communications before this Court, Dr. Todd does not employ any of those experiments that could verify the validity of his conclusions. Dr. Todd's testimony is not sufficiently tied to the facts of the case brought here, rendering the probative value of his testimony substantially outweighed by the dangers of confusing the issues or misleading the jury. *See* Fed. R. Evid. 403. For these and other reasons below, Dr. Todd's testimony is not admissible and will be excluded.

**1.     The Parties' Arguments**

The Cornerstone Defendants first argue that Dr. Todd is not qualified because "he does not practice in the same or similar" field of occupational therapy, namely habilitation and rehabilitation, as does Ms. Atkinson. (ECF No. 75, at 7.) Defendants characterize Dr. Todd's

---

[9] Dr. Todd only opines on the methodology used by Ms. Atkinson, S.P.'s occupational therapist. However, he fails to offer separate opinions about, for instance, Ms. Mastrangeli, the person who worked with S.P. when the first accusation was typed and who worked with her in criminal court. The omission of an opinion as to any other person working with S.P. on an iPad, or other device, also would risk confusing the issues or misleading the jury in a manner that substantially outweighs any probative value because Ms. Atkinson was not working with S.P. on the day of the allegations. *See* Fed. R. Evid. 403.

Ph.D. in Developmental and Child Psychology and his job as a Professor of Psychology as an entirely academic career focusing on broader issues of mental health. (ECF No. 75, at 7–8.) The Cornerstone Defendants note that although Dr. Todd "'trains clinicians' in the classroom setting, he provides no clinical services to patients" and has conceded that he lacks specific knowledge as to occupational therapy and that he could not testify as to the standard of care for occupational therapy treatment. (ECF No. 75, at 8 (citations omitted).)

The Cornerstone Defendants next assert that "Dr. Todd does not qualify" in the context of this case because (1) "he lacks an understanding of the practice of an occupational therapist"; (2) "has no patient interactions"; and (3) "does not even observe occupational therapists 'in action.'" (ECF No. 75, at 9.) They state that he "lacks relevant experience" because his "entire professional career has been in academia and none of it has been in the clinical setting," "[h]e lacks experience in occupational therapy" and "'boots on the ground' management and treatment of patients," and he "has not explained how his experience has led him to the conclusions reached." (ECF No. 75, at 10.) Defendants contend that Dr. Todd offers legal conclusions that would supplant the jury's role in this case, and that his opinion improperly attempts to undermine Ms. Atkinson's testimony. (ECF No. 75, at 15–17.)

Mr. Plantan counters that Dr. Todd need not be an expert in occupational therapy "to testify that the technique that the Cornerstone Defendants employed . . . is 'facilitated communication' and that such method is an illegitimate means by which communication may be assessed for its substantive value." (ECF No. 83, at 2.) Mr. Plantan states that because Dr. Todd will testify regarding facilitated communication "as a form of legitimate communication" and not as occupational therapy, "the Defendant's objections are . . . misguided." (ECF No. 83, at 4.) Mr. Plantan avers that because Dr. Todd will testify that the methods employed by the

14

Cornerstone Defendants "maintain the same material variables" as facilitated communication, his expertise is relevant notwithstanding the fact that he is not an occupational therapist or qualified to opine on the occupational therapy standard of care. (ECF No. 83, at 4.)

### 2. Dr. Todd's Specialized Knowledge Could Assist the Trier of Fact But is Not Presented in a Manner the Jury Can Hear

Dr. Todd presents ample qualification to testify, as a general matter, about what facilitated communication is and how to design an experiment to screen for extraneous variables to determine the validity of the results. Indeed, at oral argument, counsel clarified that the Cornerstone Defendants do not question Dr. Todd's knowledge base regarding facilitated communication. He cannot offer his testimony here, however, because other aspects of Rule 702 are not satisfied, including that which prevents an expert from rendering a legal opinion.

Rule 702(a) states that a qualified expert may testify "in the form of an opinion" if "the proponent demonstrates to the court that it is more likely than not that . . . the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). However, "[o]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." *Robles v. United States*, No. 2:19cv111 (LRL), 2020 WL 6533651, at *4 (E.D. Va. Aug. 13, 2020) (quoting *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006)) (internal quotation marks omitted).

Dr. Todd has extensive experience in: (1) child behavioral and developmental psychology, including severe, multiple handicaps, including autism, (ECF No. 57-1, at 7); (2) experimental design, including "screening for extraneous variables that undermine the validity of results", (ECF No. 83, at 4 (citation omitted)); and, (3) facilitated communication, including "formally stud[ying] facilitated communication . . . since about 1991", "attending several

15

trainings . . . given by top authorities", and "author[ing] or co-author[ing] several articles and chapters on [facilitated communication]" and the broader phenomenon of "fad interventions," especially concerning the treatment of individuals with autism spectrum disorder. (ECF No. 57-1, at 7–8, 15.)

Dr. Todd also has devoted a substantial portion of his professional life to measuring the efficacy of various behavioral interventions—especially focused on individuals with autism spectrum disorder—and debunking what he, as an expert in the field, calls pseudoscientific, non-evidence-based, or "fad interventions." (*See* ECF No. 57-1, at 12–39 (cataloguing Dr. Todd's articles, reports, reviews, and conference presentations).) Defendants concede that Dr. Todd presents ample qualification to testify, as a general matter, about what facilitated communication is and how to design an experiment to screen for extraneous variables and determine the validity of the results. Looking at this prong in isolation, Dr. Todd's "specialized knowledge" could likely "help the trier of fact understand the evidence," namely what facilitated communication is, whether it is effective, and how to test the validity and efficacy of facilitated communication. *See* Fed. R. Evid. 702(a). But that does not end the Court's analysis.

Pertinent here, Dr. Todd's report contains statements that constitute legal conclusions and, rather than helping the trier of fact understand the evidence, risk supplanting the province of the jury. Specifically, in his report Dr. Todd states that he "would also say that it appears that [Ms. Atkinson] . . . has *recklessly disregarded* the clear and overwhelming conclusions of the scientific community," and he later references "[h]er *reckless* lack of apprising herself of the basic facts and issues related to the dangers of [facilitated communication]." (ECF No. 57-1, at 2 (emphases added).) It is unclear whether Dr. Todd intended to introduce recklessness as "a legal standard or . . . a legal conclusion" but in either case, this testimony is inadmissible. *See United*

*States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006). "Recklessness" is a paradigmatic legal term with "a separate, distinct and specialized meaning in the law," and the Court will not permit an expert to even attempt to "state[] a legal standard or draw[] a legal conclusion", let alone to do so while commenting on another witness's testimony. *See McIver*, 470 F.3d at 562 (discussing "the line between a permissible opinion on an ultimate issue and an impermissible legal conclusion" and noting that the United States Court of Appeals for the Fourth Circuit "identif[ies] improper legal conclusions by determining whether the terms used by the witness have a separate, distinct and specialized meaning in the law") (citation and internal quotation marks omitted). In addition to the confusing effect Dr. Todd's testimony would have on the jury's deliberations, this sort of statement also impermissibly "states a legal standard or draws a legal conclusion by applying law to the facts." *See id.* (citations omitted).

The Court cannot permit such legal opinion testimony, even by an otherwise qualified expert such as Dr. Todd. *See McIver*, 470 F.3d at 562. Dr. Todd cannot testify to the opinions outlined in his report for the additional reasons discussed below.

### 3. Dr. Todd's Opinion Is Not Based on Sufficient Facts or Data

The second prong of Rule 702 requires that experts base their testimony on "sufficient facts or data." Fed. R. Evid. 702(b). Dr. Todd's proposed testimony falls well short of Rule 702(b) standards. In no way does he tie his generalized expertise and strong academic background to the facts at bar, meaning his experience and background cannot serve as a basis for a reliable opinion. Dr. Todd read the transcript of only one day of Ms. Atkinson's two days of deposition and, apparently, an unidentified letter that she wrote. (ECF No. 57-1, at 2; ECF

No. 75-1, at 25 (Todd Depo. Tr., at 91:6–13).)[10]   Based on these scant—at best—data points, Dr.
Todd had to make assumptions "about the position of S.P.'s fingers on the keyboard, about who
put pressure on the keys, about hand positions generally, and about who typed the words at
issue." (ECF No. 75, at 13–14 (citations omitted).)   But his suppositions impermissibly expand
well beyond what the record and his data could support.

"'[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to
admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'"
*Kumho Tire*, 526 U.S. at 157 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).   "A
court may conclude that there is simply too great an analytical gap between the data and the
opinion proffered." *Joiner*, 522 U.S. at 146 (citations omitted).   Indeed, "district courts must
ensure that an expert's opinion is 'based on scientific, technical, or other specialized *knowledge*
and not on belief or speculation.'" *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir.
2021) (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)).   A district
court's "gatekeeping function" serves "to protect juries from being swayed by dubious scientific
testimony." *Nease v. Ford Motor Co.*, 848 F.3d 219, 231 (4th Cir. 2017) (citations and internal
quotation marks omitted)).

Defendants correctly identify the problem with Dr. Todd never having seen Ms.
Atkinson—or anyone else—typing with S.P.  Those observations would have provided necessary

---

[10] Dr. Todd's expert report, (ECF No. 57-1), contains no mention of the letter Ms.
Atkinson wrote upon which he apparently relies.  However, when prompted during his
deposition, Dr. Todd acknowledged that "the only information that [he] [has]" is Ms. Atkinson's
September 2023 deposition and "a letter that she wrote." (ECF No. 75-1, at 25 (Todd Depo. Tr.,
at 91:6–13).)  Although this belated disclosure of an additional source may violate Rule 26, *see
infra*, Part III.C., this offhand comment is otherwise untethered to any specific letter in evidence.
The Court cannot speculate about which "letter" it was or how, if at all, it informed Dr.
Todd's opinion.

information and relevant facts on which to base his opinion.  Dr. Todd admits that he has not

observed Ms. Atkinson typing with S.P. in the following exchange:

> Q:   So do you hold that opinion to a reasonable degree of medical probability that every, single letter that was typed was bring pushed by [Ms. Atkinson] while she held her wrist or arm?
>
> A:   She might not have been pushing.  She might have been releasing pressure such that the pushing happened with the finger.
>
> Q:   Is that an assumption you're making?
>
> A:   I have to.  I have to assume because nobody's provided me with any video.

(ECF No. 75-1, at 18 (Todd Depo. Tr., at 70:21–71:5).)[11]  This lack of direct observation resulted

in Dr. Todd making numerous assumptions about what was taking place.  For example:

> Q:   Do you agree that the use by Wendy Atkinson of a mobile arm device to help [S.P.] gain independence in her typing was an appropriate device, yes or no?
>
> A:   I don't know because I don't know her and I don't know her specifics of her typing.  I don't know whether she can type.

(ECF No. 75-1, at 23 (Todd Depo. Tr., at 89:4–10).)[12]

---

[11] At oral argument, in response to questioning from the Court, counsel for the Cornerstone Defendants averred that the reason that Dr. Todd was not provided with video of Ms. Atkinson typing with S.P. was because "he never requested them."  Counsel for Mr. Plantan explained that he never requested them because the techniques used when typing with S.P. have changed over time, so a contemporary video of her typing would not aid Dr. Todd in speaking to how aides assisted S.P.'s typing in December 2020.  This is a questionable, and untested, assumption.

As identified above, however, Dr. Todd failed to review *other* evidence that could have supported (or contradicted) his findings.  His failure to do is fatal to his effort to offer expert testimony.

[12] At oral argument, Mr. Plantan objected that any discussion of this mobile arm device was irrelevant because it was not in use at the time Ms. Smith reported the initial allegation to law enforcement.  But he identified no evidence in the record to support that contention.  The

In lieu of direct observation, Dr. Todd reviewed only one of two days of Ms. Atkinson's deposition testimony and an unidentified letter. (ECF No. 57-1, at 2; ECF No. 75-1, at 25 (Todd Depo. Tr., at 91:6–13).) He failed to look to other important and available information.

First, he did not review the Cornerstone Therapy records regarding Ms. Atkinson's occupational therapy services with S.P.

Second, at oral argument, the Cornerstone Defendants stated that Dr. Todd was unaware that S.P. had testified twice in Mr. Plantan's criminal proceedings and did so on at least one occasion with typing assistance provided by an individual wearing headphones who could not hear the questions being asked.[13] (*See* ECF No. 84-1, at 130–31 (Smith Depo. Tr., at 129:19– 130:20).) The person in court was not Ms. Atkinson, it was Ms. Mastrangeli. Certainly Dr. Todd should have considered such events as grounding before he concluded that any typing did not represent S.P.'s own words.

Third, Plaintiff's counsel acknowledged at oral argument that Dr. Todd did not review the depositions of any of the multiple other individuals who assisted S.P. with typing, such as Ms. Smith or Ms. Mastrangeli. The record indicates that Dr. Todd did not review any evidence

---

Court highlights the exchange not because it involves the use of a mobile arm device, but rather because it illustrates that by Dr. Todd's own admission, he simply "[does]n't know [S.P.] and . . . her specifics of her typing. [He] [does]n't know whether she can type." ((ECF No. 75-1, at 23 (Todd Depo. Tr., at 89:8–10).)

[13] At oral argument, Mr. Plantan's counsel attested that he intended to produce witnesses at trial who would testify that this assisted typing with headphones did not take place in the manner described in Ms. Smith's deposition. However, Mr. Plantan has presented no such witnesses to date, and this Court has no evidence, affidavits, or witnesses before it that it could consider for summary judgment purposes.

regarding the role played by Ms. Whitlow.[14]  While counsel maintains that Ms. Atkinson was the

"ultimate source" of the typing technique deployed in December 2020 and thus her technique

was indicative of all of S.P.'s assisted typing, this Court is especially troubled that Dr. Todd did

not review the testimony of Ms. Mastrangeli who was the individual typing with S.P. on the day

that the allegations arose, as well as the individual typing with S.P. during S.P.'s testimony in

Mr. Plantan's criminal proceedings.  Nor does he articulate the facts he relied upon to find that

Ms. Atkinson was, indeed, the "ultimate source" of training.

     In this context, the minimal and partial record before Dr. Todd certainly does not present

sufficient facts or data to undergird the opinions he offers with respect to S.P.'s typing or the

veracity of the allegations at issue in this case, even given his academic background.

     Dr. Todd's proposed testimony falls well short of Rule 702(b) standards.  Because he

read only one day of Ms. Atkinson's two days of deposition testimony and an unspecified

"letter," Dr. Todd made assumptions "about the position of S.P.'s fingers on the keyboard, about

who put pressure on the keys, about hand positions generally, and about who typed the words at

issue," without sufficient evidentiary grounding.  (ECF No. 75, at 13–14 (citations omitted).)

---

[14] Ms. Danielle Whitlow was originally named as a defendant in this action but, upon motion by Mr. Plantan, has since been dismissed. (*See* ECF Nos. 1, 25–26.)  Like Ms. Mastrangeli, Ms. Smith hired Ms. Whitlow as an in-home respite care provider to assist with S.P.'s virtual schooling needs. (ECF No. 80-1 (hereinafter "Atkinson Decl.") ¶¶ 10, 12.)  Also like Ms. Mastrangeli, although Ms. Whitlow separately served as an independent contractor with Cornerstone in December 2020, and all her work with S.P. was done under direct employment by Ms. Smith. (Atkinson Decl. ¶¶ 9–12.)  As discussed in detail in the forthcoming summary judgment decision, Mr. Plantan presents no admissible evidence that Ms. Whitlow was working for, or as an agent of, Cornerstone at the time of these events. *See* note 3, *supra*.

Dr. Todd himself concedes as much.  Dr. Todd's deposition testimony illustrates his reliance on assumptions in the absence of case-specific facts or data that epitomize unreliable and inadmissible expert observations:

Q:    Okay.  Do you have any idea what [Ms. Atkinson] is doing with her eyes when she's working with [S.P.] on the typing?

A:    I haven't seen it, but I *presume* she's staring at the keyboard and staring at the output.

Q:    How can you presume something that you have no knowledge of?

A:    *Because she's doing facilitated communication*, and that's how they assure that the letters are coming out that are accurate.

Q:    So you're just making an assumption, though; isn't that right?

A:    *I'm making an assumption* based on the dozens of studies of facilitated communication and the many demonstrations of it I've seen over the years . . . And what she's described she's doing implies that she's going to be looking at the keyboard.

Q:    But you don't really know about this particular case?

A:    No[.]

(ECF No. 75-1, at 29–30 (Todd Depo. Tr., at 108:21–109:17) (emphases added).)

This exchange reveals the improper circular reasoning underlying Dr. Todd's opinion.  In the absence of actual observation of the typing that he characterizes as facilitated communication, Dr. Todd forms his assumptions from his conclusion that facilitated communication is occurring.  He cannot do so.  This amounts to *ipse dixit* of the expert that the United State Supreme Court counsels against.  *See Kumho Tire*, 526 U.S. at 157 (quoting *Joiner*, 522 U.S. at 146).  As such, this Court concludes that "there is simply too great an analytical gap between the data and the opinion proffered."  *See Joiner*, 522 U.S. at 146 (citations omitted).

Case law in the United States Court of Appeals for the Fourth Circuit, albeit unpublished, supports this finding. In *Donalds v. Ethicon, Inc.*, the Fourth Circuit affirmed the exclusion of an expert witness's proffered testimony on causation in a product-liability suit against the producer of a pelvic mesh device. No. 22-1737, 2023 WL 2446703, at *1, *3 (4th Cir. Mar. 10, 2023). The plaintiff challenged the proffered expert's "one-sentence opinion on causation," arguing that the expert "had not performed a proper differential diagnosis . . . but instead *ipse dixit* concluded" that the pelvic mesh device caused the plaintiff's injuries. *Id.* at *1–2. The district court excluded the testimony because the expert "failed to supply the basis and reasons for his opinion and he offered no explanation of his methods or how he reached his conclusion," with the result that "his opinion [did] not rise above the level of belief or speculation and [wa]s *ipse dixit*." *Id.* at *3 (internal quotation marks and citations omitted).

Similarly, any determination made by Dr. Todd about S.P.'s treatment "does not rise above the level of belief or speculation." *See id.* Unlike the medical expert in *Donalds*, Dr. Todd does provide *some* basis for his opinions, namely a portion of Ms. Atkinson's deposition testimony and a "letter." *See id.*; (ECF No. 57-1, at 2; ECF No. 75-1, at 25 (Todd Depo. Tr., at 91:6–13).) However, this limited basis presents "too great an analytical gap between the data and the opinion proffered." *See Joiner*, 522 U.S. at 146. Fatally, Dr. Todd has not reviewed "the pertinent occupational therapy treatment records for S.P." and has never observed Ms. Atkinson—or anyone else—typing with S.P. (ECF No. 75, at 11, 13–14.) In the absence of any direct observation of the typing or review of S.P.'s occupational therapy records, Dr. Todd

conceded that he instead relied on assumptions without sufficient facts or data to undergird his conclusions. (ECF No. 75, at 13–14.)[15]

At oral argument, counsel for Mr. Plantan conceded that the reliability of Dr. Todd's testimony could have been reinforced by procedures not undertaken in this case, such as video observation of S.P.'s typing, in-person observation of S.P.'s typing, or experimental tests of the reliability of S.P.'s typing. Counsel urged that the Court should admit Dr. Todd's opinions, notwithstanding these gaps, and allow cross examination to make up for what the opinion may lack in reliability. This approach would directly contradict Fourth Circuit directives. In *Sardis v. Overhead Door Corp.*, the Fourth Circuit noted that

> [w]hile district courts have broad discretion in analyzing reliability, such discretion *does not include the decision to abandon the gatekeeping function.* . . . Thus, a district court abuses its discretion if it fails to ensure that a proffered expert opinion is sufficiently relevant and reliable *when it is submitted to the jury.*

10 F.4th 268, 282 (4th Cir. 2021) (citations and internal quotation marks omitted) (second emphasis in original). Thus, this Court must be assured of the reliability of Dr. Todd's testimony *before* allowing Dr. Todd to testify at trial. While cross examination is appropriate and effective to test a witness's *credibility*, reliability and relevancy are "entirely distinct" concepts that serve as "*preconditions* to the admissibility of expert testimony." *Id.* (citing *Nease*, 848 F.3d at 229) (emphasis in original). The Court therefore declines the invitation to abandon its gatekeeping function. *See id.*

---

[15] In his opposition brief, Mr. Plantan adds that Dr. Todd also relied on "descriptions concerning the same conduct as they were referenced in Mr. Plantan's criminal case," (ECF No. 83, at 6), but this source was not identified in Dr. Todd's expert report and cannot be considered here. (*See* ECF No. 57-1.) Regardless, any such reliance would not change the outcome because it, too, admittedly suffers from the same defect of lacking any direct observation of the technique that he baldly concludes is facilitated communication.

Dr. Todd's speculation—derived from his conclusory, albeit expert, observations about the apparent fallacy underlying facilitated communication—are inadmissible with respect to S.P.'s treatment here. Dr. Todd's opinions "apply" his expertise to the facts of the case by patently insufficient means. *See Kumho Tire*, 526 U.S. at 157. Dr. Todd did not observe Ms. Atkinson or anyone else typing with S.P., nor did he review S.P.'s patient records with Cornerstone for more information on the typing methodology he concludes is facilitated communication. Dr. Todd's critical assumptions about what exactly Ms. Atkinson's assisted typing methodology entails, drawn as they are from his ultimate conclusion, present "too great an analytical gap between the data and the opinion proffered." *See Joiner*, 522 U.S. at 146 (citations omitted). Dr. Todd's response that his vast expertise allows him to make this jump does not persuade. The Court concludes that Dr. Todd's opinion regarding whether Ms. Atkinson engaged in facilitated communication is based on insufficient facts or data.[16] *See* Fed. R. Evid. 702(b). Dr. Todd's testimony is inadmissible on this basis.

### 4.    Dr. Todd's Opinion Is Not the Product of Reliable Principles and Methods

The third component of the *Daubert* analysis invokes Rule 702(c) which requires an expert's testimony to be the "product of reliable principles and methods." Fed. R. Evid. 702(c). In his expert report, Dr. Todd rightly observes that the absence of any attempt of an objective

---

[16] In so finding, the Court notes that Dr. Todd's opinion "that facilitated communication . . . has never been shown to produce reliable communication from the subject it is used on and that the messages have been shown to actually be authored by the facilitator", (ECF No. 57-1, at 1), *could*, under different circumstances, be based on sufficient facts or data about facilitated communication. This observation is relevant, but it is devoid of context to this case, meaning it cannot be admitted into evidence without confusing the issues or misleading the jury. Its probative value is substantially outweighed by its prejudicial value and it, too, must be excluded. *See* Fed. R. Evid. 403.

determination of "whether or not [Ms. Atkinson is] the author or [S.P.] is the author" of the typed material at issue should give pause. (*See* ECF No. 83, at 5 (quoting ECF No. 92, at 9 (Todd Depo. Tr., at 80:9–11)).) Unfortunately, though, Dr. Todd's expert report suffers from precisely the same defect. Dr. Todd identifies multiple experimental means to test the validity of the communications, but he deploys none of them to verify the authorship of S.P.'s typed communications. Thus, although Dr. Todd does identify reliable principles and methods by which one *could* or *would* test the validity of the communications at issue, he does not *actually* apply any principles or methods to the case before this Court. His opinion, therefore, does not rest on reliable principles and methods.

"District courts have 'considerable leeway' in determining the manner in which they evaluate an expert witness'[s] reliability." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017). In assessing the validity of a proposed expert witness's methodology, a court may consider whether the theory or technique:

> (1) "can be or has been tested"; (2) "has been subject to peer review and publication"; (3) "has a high known or potential rate of error"; and (4) is generally accepted "within a relevant scientific community."

*Id.* (citations omitted). "When the expert's proffered testimony does not rely on scientific nature, characterized by whether it 'objectively is verifiable[,]' but rather on the witness'[s] experience, the witness must explain 'how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts.'" *Robles* 2020 WL 6533651, at *2 (quoting *Peters-Mariin v. Navistar Int'l Transp. Corp.*, 410 F. App'x 612, 618 (4th Cir. 2011)). An experiential expert witness need not necessarily support his or her methodologies with peer-reviewed journals and testable methodologies, but instead can show that his or her methodologies are "generally accepted" and applied with the

"'same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Trauernicht v. Genworth Fin., Inc.*, No. 3:22-cv-532 (REP), 2024 U.S. Dist. LEXIS 95739, at *15 (E.D. Va. May 29, 2024) (quoting *Kumho Tire*, 526 U.S. at 152).

The Cornerstone Defendants assert that Dr. Todd "has failed to supply the basis and reasons for his opinions and offers no explanation for how he reached his conclusions," except for "his own expertise in recognizing facilitated communication." (ECF No. 75, at 13.) In response, Mr. Plantan argues that Dr. Todd's testimony is "predicated on the facts of the case concerning the described and apparent methods . . . employed by the [Cornerstone] Defendants." (ECF No. 83, at 5.) In support, Mr. Plantan quotes a section of Dr. Todd's deposition testimony, in which Dr. Todd discusses "[t]he technique [Ms. Atkinson] is describing" as "exactly what I was taught in facilitated communication workshops, what I see in [facilitated communication] textbooks, [and] what I see described by . . . the people . . . who are in the forefront of facilitated communication." (ECF No. 83, at 5 (internal quotation marks omitted) (quoting ECF No. 92,[17] at 9 (Todd Depo. Tr., at 80:21–25)) (second alteration in original).) Specifically, Dr. Todd stated:

> [Ms. Atkinson]'s holding . . . she's supposedly supporting the child's hand. She's typing by selecting letters sequentially. She has not . . . [S.P.] doesn't sit there, as your photo misleadingly shows, typed out with fingers, all her fingers or something like that. [Atkinson] is holding the child's arm or wrist, and typing has occurred entirely through the intervention of another verbal person.

---

[17] Mr. Plantan's opposition referenced an "Exhibit B" that was not attached to his initial opposition "due to it being malformed." (*See generally* ECF No. 83; ECF No. 92, at 1.) Mr. Plantan avers that counsel for the Cornerstone Defendants "was notified and had the relevant deposition in her possession." (ECF No. 92, at 1.) He later re-filed Exhibit B, which is docketed at ECF No. 92. For ease of reference, the Court cites to ECF No. 92 throughout.

(ECF No. 92, at 9 (Todd Depo. Tr., at 80:1–8.) Mr. Plantan declares that Dr. Todd thus "testifies to the variables that form the basis of his conclusion." (ECF No. 83, at 5.)

In his deposition testimony, Dr. Todd further notes that "there has been no evidence that [Ms. Atkinson has] done anything objective to determine whether or not she's the author or the child is the author." (ECF No. 83, at 5 (internal quotation marks omitted) (quoting ECF No. 92, at 9 (Todd Depo. Tr., at 80:9–11).) Mr. Plantan avers that Dr. Todd "has expertise in evaluating 'prompt dependency,' and whether a therapist or third-party is properly removing prompts or unconsciously providing other prompts." (ECF No. 83, at 5.)

As an initial matter, the Court observes that "notice [during] deposition [testimony] is insufficient to cure a failure to disclose materials that ought to have been included in the expert report because disclosure in the right form (complete) and at the right time (with the expert report, before the expert's deposition) is critical to an opposing party's ability to engaged in meaningful expert discovery." *Samsung Elecs. Co., Ltd. v. Nvidia Corp.*, 314 F.R.D. 190, 198 (E.D. Va. 2016). To the extent that Dr. Todd's deposition identifies supposed "variables" that underlie his conclusion, those variables were not identified in his expert report.[18] Further, the fact that Mr. Plantan describes Dr. Todd's fleeting observations as "variables" does not render them scientific.

---

[18] As far as this Court could discern, the "variables" Mr. Plantan refers to are the scattershot observations that Dr. Todd recounted in his deposition testimony: namely, that Ms. Atkinson is "supposedly holding the child's hand", that she "is typing by selecting the letters sequentially", and that "typing has occurred entirely through the intervention of another verbal person." (*See* ECF No. 92, at 9 (Todd Depo. Tr., at 80:1–8).) At oral argument, counsel for Mr. Plantan confirmed that these would be the variables at issue. This confirms their inadmissibility as unreliable.

Dr. Todd rightly observes that the lack any testing to verify the true author of the communications raises concern. Regrettably, though, his own report suffers from precisely the same defect. Dr. Todd's expert report identifies multiple experimental designs that could test the validity of the communications, describing both "single-blind" and "double-blind" tests. (*See* ECF No. 57-1, at 3.) He may well be qualified to evaluate prompt dependency. (*See* ECF No. 83, at 5.) But he did not conduct *any* test to evaluate S.P.'s prompt dependency in this case. Thus, although Dr. Todd identifies reliable principles and methods by which one *could* or *would* validate the communications at issue, he never *actually* applies them to S.P.'s case. Instead, he suggests that the factfinder take his word for it because the description of the assisted typing that he read in a deposition transcript sounds like "what [he] was taught." (*See* ECF No. 83, at 5 (quotation omitted).) This reliance on Dr. Todd's conclusory reasoning based on "what [he] was taught," (*see* ECF No. 83, at 5 (quotation omitted)), does not constitute reliable principles or methods.

Considering the *Bresler* factors, the Court concludes that Dr. Todd's testimony regarding whether Ms. Atkinson engaged in facilitated communication is unreliable. First, Dr. Todd's method, as far as the Court can discern, is that Ms. Atkinson engaged in facilitated communication because his experience teaches him that what is described is facilitated communication. Unlike the single-blind or double-blind experiments that would objectively measure the validity of the communications produced, Dr. Todd's determination that Ms. Atkinson engaged in facilitated communication (1) cannot be tested; (2) has not been subject to peer review and publication; (3) does not have a knowable rate of error; and (4) is generally not "accepted 'within a relevant scientific community.'" *See Bresler*, 855 F.3d at 195. Accordingly, Dr. Todd's experience "does not rely on scientific nature" and is not "objectively . . . verifiable."

*See Robles*, 2020 WL 6533651, at *2 (citations and internal quotation marks omitted).

Therefore, Dr. Todd "must explain 'how [his] experience leads to the conclusion reached, why

[his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied

to the facts.'" *See id.* (citations and internal quotation marks omitted).  He does not do so.

In *Robles*, the plaintiff retained an "expert in the field of vessel operations, seamanship,

ship handling, marine safety, and training" to "opine upon whether the task assigned to [the

plaintiff]"—namely, moving trash onboard a boat without assistance—"fell below the industry

standard of care." 2020 WL 6533651, at *1.  The expert report opined that "[h]ad a [Job Hazard

Analysis ('JHA')] been completed, perhaps there would have been a recognition of the need for

someone else to assist [the plaintiff]." *Id.* at *4 (quotations and internal citation marks omitted).

The court deemed it "speculative for [the expert] to opine that 'perhaps' something different

would have happened if a [JHA] had been conducted" where he "[did] not describe what a JHA

would have disclosed, what measures that disclosure would have brought about, and how those

measures might have avoided any resulting injury, leaving those matters open to speculation."

*Id.* at *4.  The court concluded that such testimony would be "unhelpful, unreliable, and

inadmissible" and excluded the testimony. *Id.* at *4–5.

Similarly, Dr. Todd's report suggests that if he *had* tested the validity of S.P.'s

communications, that test would reveal that S.P. was not the true author.  Although Dr. Todd

*articulates* principles and methods—such as single-blind and double-blind tests—that may

constitute reliable methods by which to discern whether Ms. Atkinson engaged in facilitated

communication, like the expert in *Robles*, he failed to actually *conduct* such tests, "leaving those

matters open to speculation." *See id.* at *4.  Dr. Todd's experience alone (even were it to present

reliable principles to apply to S.P.'s case) constitutes an insufficient method by which to

30

conclude that Ms. Atkinson engaged in facilitated communication with S.P.  Dr. Todd has never

seen Ms. Atkinson—or anyone else—typing with S.P., he relies on faulty assumptions, and he

fails to apply the very tests that he himself identifies as objective, reliable indicators of the

validity of assisted communications.  Dr. Todd's testimony is also inadmissible as unreliable on

this third basis.  *See* Fed. R. Evid. 702(c).

> **5.     Dr. Todd's Opinions Do Not Reflect a Reliable Application of the
> Principles and Methods to the Facts of This Case**

Finally, Rule 702 requires that an expert "reflects a reliable application of the principles

and methods to the facts of the case."  Fed. R. Evid. 702(d).  The Cornerstone Defendants argue

that Dr. Todd's "opinions lack 'the same level of intellectual rigor that characterizes the practice

of an expert in the relevant field'", and that "he fails to explain what facts he considered in

forming his opinions."  (ECF No. 75, at 19 (quoting *Kumho Tire*, 526 U.S. at 152).)

Mr. Plantan responds by averring that Dr. Todd's conclusions "are subject to review and

scrutiny based on the literature and reports in his field of study, the variables underlying [Ms.]

Atkinson's physical assistance of S.P.'s typing, and the available tests for undermining the

claims."  (ECF No. 83, at 6.)  Mr. Plantan posits that "Dr. Todd reliably applied his principles of

review as they relate to identifying specific measures used by [Ms.] Atkinson with S.P. . . . ,

scrutinize[ed] those measures according to academic studies and his expertise as it relates to

early-childhood behavioral development, and came to a reliable, sound conclusion that comports

with those of others concerning [Ms.] Atkinson's methods."  (ECF No. 83, at 6.)  He urges that

Dr. Todd utilizes "reliable methods of scrutiny and the reasons that he comes to his conclusions

are capable of being refuted if alternative reports or objective peer-reviewed results exist to the

contrary."  (ECF No. 83, at 6.)

Because the Court has concluded that Dr. Todd's testimony is not the product of reliable principles and methods, but rather of *ipse dixit* based on his experience and insufficient case-specific facts and data, the Court must also find that Dr. Todd's opinion does not reflect a reliable application of those principles and methods to the facts of this case. Dr. Todd's testimony is inadmissible for this reason as well. *See* Fed. R. Evid. 702(d). In sum, Mr. Plantan does not establish the admissibility of Dr. Todd's expert testimony even by a preponderance of the evidence.

### C.      Analysis Under Federal Rule of Civil Procedure 26 Would Be Duplicative

Federal Rule of Civil Procedure 26(a)(2)(B)[19] provides that an expert witness must file a

written report that contains, *inter alia*, "a complete statement of all opinions the witness will

express and the basis and reasons for them" and "the facts or data considered by the witness in

---

[19] Rule 26(a)(2)(B) states, in pertinent part:

(a) REQUIRED DISCLOSURE.

    (2) *Disclosure of Expert Testimony.*
         *          *          *

    (B) *Witnesses Who Must Provide a Written Report.*  Unless
    otherwise stipulated or ordered by the court, this disclosure must
    be accompanied by a written report—prepared and signed by the
    witness—if the witness is one retained or specially employed to
    provide expert testimony in the case . . . .  The report must contain:

        (i) a complete statement of all opinions the witness will
        express and the basis and reasons for them; [and]

        (ii) the facts or data considered by the witness in
        forming them[.]

Fed. R. Civ. P. 26(a)(2)(B).

forming them." Fed. R. Civ. P. 26(a)(2)(B).  Pursuant to Rule 37(c)(1),[20] a party who fails to properly designate an expert witness as required by Rule 26 is prohibited from using that expert at trial, "unless the failure was substantially justified or harmless."  Fed. R. Civ. P. 37(c)(1).

The Cornerstone Defendants assert that "the Report is deficient under Rule 26" because "Dr. Todd provides only a general description of facilitated communication" and "fails to provide any specific information from which the [C]ourt could determine what facts or data he considered in arriving at his opinion."  (ECF No. 75, at 19.)  At oral argument, the Cornerstone Defendants explained that Dr. Todd failed to disclose in his report that he had testified in Mr. Plantan's criminal proceedings.  Mr. Plantan does not respond to this allegation in his briefing. (*See generally* ECF No. 83.)  At oral argument, counsel for Mr. Plantan conceded that it was "an oversight" not to disclose Dr. Todd's prior testimony in Mr. Plantan's criminal proceeding as part of the expert report in this civil action.[21]

The Court "has determined that Rule 702, rather than Rule 37(c), is the proper vehicle to address the deficiencies of [Mr. Plantan's] expert."  *See Fernaays v. Isle of Wight Cnty.*, No.

---

[20] Rule 37(c)(1) provides, in pertinent part:

(c) FAILURE TO DISCLOSURE, TO SUPPLEMENT AN EARLIER RESPONSE, OR TO ADMIT.

(1) *Failure to Disclosure or Supplement.*  If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1).

[21] Even with this admission, Dr. Todd does not anywhere suggest that he saw parts of the criminal proceeding, such as S.P. typing, that informed his opinion one way or the other.

34

2:21cv99 (LRL), 2022 WL 866416, at *12 (E.D. Va. Mar. 23, 2022).  This is so because "[f]undamentally, the greatest problem with the expert opinion[] is that [it is] unreliable under Rule 702 and *Daubert.*"  *See id.*  The bases that the Cornerstone Defendants identify in arguing for Dr. Todd's report's insufficiency under Rule 26 mirror those that they identify in arguing for the report's inadmissibility under Rule 702 and *Daubert*.  Having already found in favor of the Cornerstone Defendants under Rule 702 and *Daubert*, the Court declines to undertake a Rule 26 analysis.  The outcome would not differ.

### IV.  Conclusion

For the foregoing reasons, the Court will grant the Motion.  (ECF No. 74.)

An appropriate Order shall issue.

Date: 06/18/2024
Richmond, Virginia

/s/
M. Hannah Lauck
United States District Judge

35