IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

KEVIN PLANTAN,

        Plaintiff,

    v.                                Civil Action No. 3:22cv407

KELLY SMITH, *et al.*,

        Defendants.

## MEMORANDUM OPINION
### *Summary Judgment*

This matter comes before the Court on Defendant Kelly Smith's Motion for Summary Judgment (the "Smith Motion"), (ECF No. 77), and Defendants Wendy Atkinson and Cornerstone Therapy Associates, LLC's ("Cornerstone") (collectively, the "Cornerstone Defendants") Motion for Summary Judgment (the "Cornerstone Motion"), (ECF No. 79) (collectively, the "Motions for Summary Judgment" or the "Motions"). On January 5, 2024, Ms. Smith and the Cornerstone Defendants filed their Motions. (ECF Nos. 77, 79.) On January 12, 2024, Plaintiff Kevin Plantan filed a Response in Opposition to Defendant Kelly Smith's Motion for Summary Judgment, (ECF No. 84), and a Response in Opposition to Cornerstone Defendants' Motion for Summary Judgment, (ECF No. 85). On January 16, 2024, Ms. Smith filed her Reply Memorandum in Support of Her Motion for Summary Judgment, (ECF No. 86), and the Cornerstone Defendants filed their Reply to Opposition Regarding Motion for Summary Judgment, (ECF No. 91), along with a Motion to Strike Plaintiff's Opposition to Motion for Summary Judgment (the "Motion to Strike"), (ECF No. 88). On March 25, 2024, the Court denied the Motion to Strike and its accompanying Motion for Hearing, (ECF No. 90). (ECF Nos. 98–99.)

The Defendants also filed contemporaneous Motions for Hearing on each of the Motions for Summary Judgment.  (ECF Nos. 81, 82.)  On April 5, 2024, the Court heard oral argument on the Motions for Summary Judgment along with the contemporaneously filed Motion to Exclude Opinions of James Todd, PhD, (ECF No. 74), which the Court addressed in a separate Memorandum Opinion issued on June 18, 2024.  (ECF No. 102.)  Dr. Todd's testimony has been excluded.  These matters are ripe for disposition.

For the reasons articulated below, the Court will grant the Motions for Summary Judgment and will dismiss this action against Ms. Smith and the Cornerstone Defendants.  (ECF Nos. 77, 79.)

## I.  Factual and Procedural Background

### A.    Background to the Dispute with Respect to Facilitated Communication

This action arises from the arrest and subsequent detention of Mr. Plantan based on allegations that he sexually molested his minor daughter, S.P.  (ECF No. 1 ¶¶ 38–71.)  Mr. Plantan maintains his innocence.  (*See generally* ECF No. 1.)  Ms. Smith is Mr. Plantan's ex-wife and S.P.'s mother.  (ECF No. 1 ¶ 16–17; ECF No. 78-1 ("Smith Aff.") ¶¶ 3–4.)  The Court will present in depth the uncontradicted facts below, but preliminary background is necessary.

S.P. suffers from severe dyspraxia, a motor function disorder that severely limits, alters, and impacts her ability to control her own movements.  (ECF No. 1 ¶¶ 17, 19–20; Smith Aff. ¶¶ 4, 11.)  At some point between when she was two-and-a-half and six years old, S.P. became nonverbal.  (ECF No. 1 ¶ 21; Smith Aff. ¶ 20.)  She remains so today.  (ECF No. 1 ¶ 21; Smith Aff. ¶ 20.)  Ms. Atkinson and Cornerstone, her company, have provided therapy to S.P. over the years.  As part of her ongoing therapy, S.P. has been exposed to keyboarding in an effort to allow her to communicate with others.  On December 27, 2020, S.P., working with a respite service

2

provider named Olivia Mastrangeli, purportedly typed a message accusing her father of sexual abuse.

Whether Ms. Smith, Ms. Mastrangeli, or others have been engaging in facilitated communication (*i.e.*, providing the substantive answers when S.P. has been communicating via keyboard rather than S.P. doing so herself) lies at the heart of this dispute. Although at first blush the issue of facilitated communication appears to present an archetypal factual dispute requiring a trial, the record the parties developed—and did not develop—through discovery reveals that facilitated communication is not material to the summary judgment motions before the Court.

Mr. Plantan believes that this case turns primarily on the legitimacy of facilitated communication—something he calls a debunked and illegitimate means of "interpreting" the voice of a non-verbal person when, in fact, the "voice" is that of what the interpreter thinks the nonverbal person would express.[1]  But in the first instance, the parties do not disagree about

---

[1] Mr. Plantan designated an expert in this case, Dr. James Todd. (*See* ECF No. 57.)  Dr. Todd would have opined "that facilitated communication . . . has never been shown to produce reliable communication from the subject it is used on and that the messages have been shown to actually be authored by the facilitator." (ECF No. 57-1, at 1.)  He also would have opined that Ms. Atkinson "recklessly disregarded the clear and overwhelming conclusions of the scientific community that facilitated communication is ineffective and dangerous." (ECF No. 57-1, at 2.)

After briefing and oral argument, the Court excluded the testimony of Dr. Todd. (ECF No. 102.)  The Court found that Dr. Todd presented ample academic expertise on the legitimacy of facilitated communication, but that he did not proffer information a jury could consider. (ECF No. 102, at 15–17.)  Dr. Todd never saw any form of communication from S.P. but nonetheless rendered an improper legal conclusion that Ms. Atkinson acted recklessly in disregarding the illegitimacy of facilitated communication while using it. (ECF No. 102, at 17–25.)  To find that Ms. Atkinson (who was not working with S.P. at the time of the accusation) was "using" facilitated communication, he relied on his experience, but then read only one of two days of her deposition testimony and an unspecified letter that she wrote. (ECF No. 57-1, at 2; ECF No. 75-1, at 25 (Todd Depo. Tr., at 91:6–13).).  He failed to review a plethora of additional evidence available to him, including the deposition of the respite caregiver who was typing with S.P. when

3

whether facilitated communication is illegitimate.  To the extent that Mr. Plantan seeks to put the

legitimacy of facilitated communication before a jury, he cannot do so here, because the

Defendants do not dispute the illegitimacy of facilitated communication.  (*See* ECF No. 84-1

("Smith Depo. Tr."), at 121:7–122:23 (contesting the school's characterization of the typing as

facilitated communication); Smith Aff. ¶¶ 87–88 (Ms. Smith's personal "experiences typing with

S.P. and observing others typing with S.P. did not support [a] suggestion" that the method of

communication was invalid or anything other than S.P.'s own words); ECF No. 75-3, at 2 (Ms.

Atkinson "do[es] not support facilitated communication" and "understand[s] the 'bad rap'

facilitated communication has and do[es] not wish to be a part of that"); ECF No. 83-1, at 67, 78

("Atkinson Depo. Tr."), at 63:13–64:11 (Ms. Atkinson "would [not] say that . . . [she] believe[s]

in facilitated communication" and does not consider her method of assisted typing to constitute

facilitated communication), 78:18–20 ("I did not intend it to be a communication method that

she just jumped on as an individual herself, but she's a bright young lady."), 79:15–17

(recounting how the school "called it facilitated communication rather than motor skill

development"), 80:2–5 ("She's typing these words.  She's saying things that I would never even

think to say.  It's nothing to do with facilitated communication.").)

    Second, while a genuine dispute may exist over whether S.P.'s supported typing

constitutes facilitated communication, that dispute is not material to the outcome of this

---

she initially made the allegations against Mr. Plantan.  (ECF No. 102, at 20–21.)  His opinion
utterly lacked sufficient facts or data regarding S.P.'s assisted typing.  (*See generally* ECF
No. 102.)

    Nor was Dr. Todd's opinion the product of reliable principles and methods applied to the
facts of the case, such as a single-blind or double-blind experiment.  (ECF No. 102, at 13, 24–
31.)  Dr. Todd failed to conduct such experiments regarding S.P.'s keyboarding communication
despite opining that such experiments would constitute a reliable means to test for the use of
facilitated communication.

summary judgment motion.  Two counts remain:  Malicious Prosecution and Intentional Infliction of Emotional Distress.   As to Count III's Malicious Prosecution claim, Mr. Plantan must demonstrate that the defendants acted "maliciously" and "without probable cause".  *See Bennett v. R & L Carriers Shared Servs., LLC*, 492 F. App'x 315, 316 (4th Cir. 2012) (citation and internal quotation marks omitted).  As to Count V's Intentional Infliction of Emotional Distress (IIED) count, Mr. Plantan must show that Ms. Smith acted in an "outrageous and intolerable" manner.  *See Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974).  Even assuming for the sake of argument that the Defendants *did* engage in facilitated communication, the Court must conclude that Mr. Plantan has failed to identify "any [evidence] upon which a jury could properly proceed to find a verdict for [him]" on these two causes of action.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986) (citations and internal quotation marks omitted).  Mr. Plantan has not identified admissible evidence that the Cornerstone Defendants engaged in his prosecution maliciously or without probable cause, both of which are required to establish a malicious prosecution claim.  Because Mr. Plantan has failed to raise a genuine dispute regarding probable cause, he necessarily has also failed to raise a genuine dispute as to the outrageousness or intolerability of the reporting, because a report supported by probable cause cannot be outrageous or intolerable.  Thus, facilitated communication is immaterial to the motions currently before this Court.

B.   **Factual Background**[2]

1.   **Ms. Smith and Mr. Plantan's Divorce, S.P.'s Diagnoses, and Custody Arrangements**

Mr. Plantan and Ms. Smith married in 2001 and divorced either nine or ten years later, in 2010 or 2011.[3]  (ECF No. 1 ¶ 16; Smith Aff. ¶¶ 3, 14.)  The couple's only child, S.P., born in 2007, was diagnosed as a young child with "regressive autism" and later "severe dyspraxia, a motor-function disorder that severely limits, alters, and impacts her ability to control her own physical movements."  (ECF No. 1 ¶¶ 17, 19–20; Smith Aff. ¶¶ 4, 11.)  At some point between ages two-and-a-half and six (the parties dispute the exact age),[4] S.P. became nonverbal, a condition that persists to this day.  (ECF No. 1 ¶ 21; Smith Aff. ¶ 20.)

In August 2010, when S.P. was three years old, Mr. Plantan left the home and moved to the City of Richmond to live with his new girlfriend.  (Smith Aff. ¶ 12.)  Mr. Plantan went several months without seeing S.P. and Ms. Smith was granted sole custody.  (Smith Aff. ¶ 13.)

---

[2] When considering a motion for summary judgment, a court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995).

[3] Mr. Plantan's Complaint alleges that he and Ms. Smith "divorced in 2010." (ECF No. 1 ¶ 16.)  Ms. Smith's Affidavit explains that she and Mr. Plantan "were divorced by a Final Decree of Divorce entered in the Circuit Court for the County of Henrico on March 30, 2011." (Smith Aff. ¶ 14.)  The precise date is immaterial because neither party asserts that the date of divorce relates to the allegations in any way, so the Court does not determine the exact year.

[4] Ms. Smith avers in a sworn affidavit that "[o]n July 31, 2013, S.P., then 6 years of age, had an abrupt and unexplained loss of speech which has persisted to this day." (Smith Aff. ¶ 20.)  Mr. Plantan, in contrast, alleges in his unverified Complaint that "[a]t approximately two and a half years old, S.P. became nonverbal." (ECF No. 1 ¶ 21.)  The precise age at which S.P. became nonverbal is immaterial because the causes of action underlying this litigation challenge only the reasonableness of Ms. Smith's belief in the typed communications, and no party argues that the age at which S.P. became nonverbal impacts the reasonableness of Ms. Smith's belief.

Approximately two years later, in 2012, by agreement of the parties, Mr. Plantan began exercising overnight visitation with S.P., who was then 5 years old. (Smith Aff. ¶ 17.) In 2013, when S.P. was six years old, Mr. Plantan remarried and moved to his new wife's residence in Chesterfield County, Virginia. (Smith Aff. ¶ 18.) The parties amended their custody arrangement to grant Mr. Plantan joint legal custody, and he began exercising overnight visitation with S.P. on alternate weekends. (Smith Aff. ¶ 19.)

By February 2016, Mr. Plantan had separated from his second wife and moved to a cabin in a private campground in Caroline County, Virginia. (Smith Aff. ¶ 26.) Throughout that summer, Mr. Plantan saw S.P. on alternating weekends when she would stay with him at his cabin for overnight visitation. (Smith Aff. ¶ 26.) From August 2016 to October 2016, when S.P. was nine years old, Ms. Smith and her new husband permitted Mr. Plantan to live on their property in a shed which they had fixed up as a guesthouse. (Smith Aff. ¶¶ 28–29.)

On Sunday, June 11, 2017, Mr. Plantan returned S.P., age ten, to Ms. Smith's residence after a weekend overnight visitation. She arrived "disheveled and agitated." (Smith Aff. ¶ 31.) When S.P. got out of Mr. Plantan's vehicle, she "ran down to the barn on [Ms.] Smith's property where she proceeded to inexplicably pace back and forth for hours." (Smith Aff. ¶ 31.) Following that day, S.P.'s behavior "became increasing[ly] erratic and she refused to get in a vehicle for six weeks." (Smith Aff. ¶ 31.)

In April 2019, when S.P. was twelve years old, the Hanover Juvenile and Domestic Relations District Court amended Mr. Plantan's visitation to supervised visits one Saturday each month for four hours. (Smith Aff. ¶ 37.) In September 2019, Mr. Plantan moved to Florida and had no contact with S.P. for approximately six months until March 2020, when he began placing

7

FaceTime calls with S.P.  (Smith Aff. ¶¶ 40, 42.)  He next exercised in-person visitation with

S.P. in June 2020, when S.P. was thirteen.  (Smith Aff. ¶ 43.)

### 2.   S.P.'s Occupational Therapy, Education, and Typing

#### a.   S.P.'s Typing with Cornerstone Defendants

Ms. Atkinson is an occupational therapist licensed to practice in the Commonwealth of

Virginia.  (ECF No. 80-1 ("Atkinson Decl.") ¶ 1; Smith Aff. ¶ 32.)  She is also the owner of

Cornerstone.  (Atkinson Decl. ¶ 4.)  The record establishes that Ms. Atkinson began working

with S.P. in 2011.[5]  (ECF No. 1 ¶¶ 34–35; Smith Aff. ¶32; Atkinson Decl. ¶ 5.)

Other than Ms. Atkinson, no individual has been assigned through Cornerstone to work

with S.P.  (Atkinson Decl. ¶ 7.)  Ms. Olivia Mastrangeli[6] and Ms. Danielle Whitlow[7] were

---

[5] The parties dispute the date.  In his unverified Complaint, Mr. Plantan alleges that in 2019, Ms. Smith hired the Cornerstone Defendants to begin using "a form of facilitated communication with S.P. to assist her with virtual learning among other things."  (ECF No. 1 ¶ 34.)  In a sworn declaration, Ms. Atkinson avers that she has been working with S.P. since S.P. was four years old, which implies that Ms. Atkinson began working with S.P. in about 2011.  (Atkinson Decl. ¶ 5.)  Ms. Smith likewise represents, in a sworn affidavit, that Ms. Atkinson began providing S.P. occupational therapy services in 2011.  (Smith Aff. ¶ 32.)  To identify a genuine dispute, Mr. Plantan must support his position with "*admissible* evidence," *see Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added).  He has not done so here.

[6] Ms. Mastrangeli was originally named as a defendant in this action but, on motion by Mr. Plantan, she has been dismissed.  (*See* ECF Nos. 1, 25–26.)  Ms. Smith hired Ms. Mastrangeli as an in-home respite care provider to assist with S.P.'s virtual schooling needs.  (ECF No. 80-1 (hereinafter "Atkinson Decl.") ¶¶ 10, 12.)  Ms. Mastrangeli served as an independent contractor with Cornerstone in December 2020 and all her work with S.P. occurred under direct employment by Ms. Smith, not Cornerstone.  (Atkinson Decl. ¶¶ 9–10.)  Mr. Plantan presents no admissible evidence that Ms. Mastrangeli was working for, or as an agent of, Cornerstone at the time of these events.  *See Mitchell*, 12 F.3d at 1316.

[7] Ms. Whitlow was originally named as a defendant in this action but, on motion by Mr. Plantan, she has been dismissed.  (*See* ECF Nos. 1, 25–26.)  Ms. Smith hired Ms. Whitlow as an in-home respite care provider to assist with S.P.'s virtual schooling needs.  (Atkinson Decl. ¶¶ 11–12.)  Ms. Whitlow served as an independent contractor with Cornerstone in December 2020

independent contractors with Cornerstone from December 2020 to August 2022 and from August 2020 to August 2021, respectively. (Atkinson Decl. ¶¶ 9, 11.) However, neither Ms. Mastrangeli nor Ms. Whitlow provided any services to S.P. *through Cornerstone* at any time in any capacity. (Atkinson Decl. ¶¶ 9, 11.) During all times relevant to the lawsuit, Ms. Smith employed Ms. Mastrangeli and Ms. Whitlow directly "to provide in-home respite services[8] to S.P. and specifically to help her with school-related tasks." (Atkinson Decl. ¶¶ 10, 12.)

Keyboarding is "a minimal part" of the occupational therapy that Ms. Atkinson provides to S.P. (Atkinson Decl. ¶ 17; Smith Depo. Tr., at 115:18–116:4.) Ms. Atkinson works with S.P. on, *inter alia*, "develop[ing] her motor skills" so that S.P. can learn to "type independently." (Atkinson Depo. Tr., at 66:18–22, 77:5–21.) The Cornerstone Defendants characterize the assistance S.P. receives as "light support to her wrist or elbow on a regular iPad[] with a regular keyboard" and aver that "[w]hen S.P. types, S.P.'s fingers are the only fingers that touch the keyboard." (ECF No. 80, at 9 (citing Atkinson Decl. ¶¶ 18–19; Atkinson Depo. Tr., at 38:17–22, 54:11–15; 91:14–92:7; ECF No. 80-2 ("Atkinson Depo. Part 2 Tr."), at 119:23–25; Smith Depo. Tr., at 56:18–23).) Wendy Atkinson never directs S.P.'s fingers. (ECF No. 80, at 9 (citing Atkinson Decl. ¶ 19; Atkinson Depo. Tr., at 38:17–22, 91:14–92:7; Atkinson Depo. Part 2 Tr., at 119:23–25).) Ms. Smith likewise "never directs [S.P.'s] fingers and has never seen anyone direct her fingers, nor does anyone push S.P.'s fingers down on the keys." (ECF No. 80, at 9 (citing

---

and all her work with S.P. occurred under direct employment by Ms. Smith, not Cornerstone. (Atkinson Decl. ¶¶ 11–12.) Mr. Plantan presents no admissible evidence that Ms. Whitlow was working for, or as an agent of, Cornerstone at the time of these events. *See Mitchell*, 12 F.3d at 1316.

[8] At oral argument, counsel for the Cornerstone Defendants explained that "respite services" involve caregiving support in S.P.'s activities of daily living, such as getting dressed and eating meals, as opposed to providing occupational therapy services. Mr. Plantan did not dispute this characterization.

Smith Depo. Tr., at 100:1–25).)  Ms. Mastrangeli similarly attests that she "would provide physical support and stability for S.P.'s right arm," and specifically that S.P. "would place her right arm on top of [Ms. Mastrangeli's] hand."  (ECF No. 78-3 ("Mastrangeli Aff.")  ¶¶ 7–8.)  Ms. Mastrangeli averred that she "did not control or direct which keys . . . S.P. would touch."  (ECF No. 78-3 ¶ 9.)[9]

According to Ms. Atkinson, S.P. has progressed and is becoming more independent in her typing.  (Atkinson Decl. ¶ 18.)  According to Ms. Smith, S.P. is "fast" and "fluent" in her typing for communication now.  (Smith Depo. Tr., at 24:18, 56:18–23.)

### b.   Non-Cornerstone Typing History

In 2015, Ms. Smith and S.P., then eight years old, attended a two-day workshop in Charlottesville, Virginia in which Elizabeth Vosseller taught "the science and fundamentals of spelling to communicate using an alphabet letter board."  (Smith Aff. ¶ 24.)  Over the next two years, Ms. Smith worked with S.P. on using the letterboard to spell to communicate, and Ms. Smith took S.P. to see Ms. Vosseller in Herndon, Virginia for additional training.  (Smith Aff. ¶ 25.)  Ms. Smith's personal "experiences typing with S.P. and observing others typing with S.P. did not support [a] suggestion" that the method of communication was invalid or anything other than S.P.'s own words.  (Smith Aff. ¶¶ 87–88.)

S.P. has used an iPad since elementary school.  (Smith Depo. Tr., at 23:6–24:3; Smith Aff. ¶ 35.)  In 2018, when S.P. was eleven years old and in the fifth grade at Kersey Creek Elementary School in Hanover County, she worked with her teachers "to use a keyboard to spell words."  (Smith Aff. ¶ 36.)

---

[9] The record contains no affidavit or deposition transcript from Ms. Whitlow.

From September 2019 to March 2020, S.P. was enrolled as a student in the restrictive autism classroom at Oak Knoll Middle School in Hanover County.  She worked both at home and at school on typing, with assistance to communicate.  (Smith Aff. ¶¶ 38–39, 41.)  S.P.'s school occupational therapist used a variety of accommodations to assist S.P.'s keyboard typing, including a slant board, hand/wrist support, and a dowel for stabilization.  (Smith Aff. ¶ 39; Smith Depo. Tr., at 19:21–20:6.)

In September 2020, when S.P. was thirteen, the school speech therapist, Lauren Whitlock, suggested an iPad for keyboarding, and the school provided one.  (Smith Depo. Tr., at 22:9–23:1.)

### c.   S.P.'s IEPs[10]

In February 2020, when S.P. was thirteen, the Occupational Therapy Update to S.P.'s Individualized Education Program ("IEP") reported that "minimal forearm support is provided

---

[10] According to the Virginia Department of Education:

An individualized education program (IEP) is a written statement designed to meet a student's unique needs and must be in effect:

- at the beginning of each school year;
- before special education and related services are provided for a student; and
- as soon as possible after a parent consents to the IEP.

The IEP is a very important document for students with disabilities and for those who are involved in educating them.  The IEP should provide information specific to the student and improve teaching, learning and results.  Each student's IEP describes, among other things, the educational program that has been designated to meet their unique needs.

IEP & Instruction, VA. DEP'T EDUC., https://www.doe.virginia.gov/programs-services/special-education/iep-instruction#:~:text=An%20individualized%20education%20program%20(IEP, parent%20consents%20to%20the%20IEP (last accessed Apr. 15, 2024).

for [S.P.] when typing (uses dowel rod placed in palm of her hand and therapist holds other end

or therapist will offer minimal support at wrist without use of dowel rod)." (Smith Aff.

Attachment No. 1, at 8).)

On October 27, 2020, Ms. Atkinson wrote a letter to S.P.'s IEP team in which she

detailed the keyboarding work that she had undertaken with S.P. (ECF No. 75-3.) The letter

responded to a recent IEP meeting, and Ms. Atkinson sought "to weigh in on some things that

members of the team may not be aware of." (ECF No. 75-3, at 1.) She explained that she "was

giving very minimal support at the wrist or elbow" at first and that she "did not like that [she]

had to hold [S.P.'s] hand to support in any way as [she] wanted [S.P.] to be able to do it

independently." (ECF No. 75-3, at 1–2.) Ms. Atkinson attested that for individuals with

dyspraxia, "[t]he best activities for them are those that have a repeated motor pattern", such as

keyboarding, and that "since online school started, [S.P.] is getting better and faster at her

typing." (ECF No. 75-3, at 2.) She reported that they were "trialing elbow support boards,

finger typing splints etc. . . . to try to encourage increased independence" and emphasized that

she "do[es] not support facilitated communication." (ECF No. 75-3, at 2.) Ms. Atkinson averred

that she "understand[s] the 'bad rap' facilitated communication has and do[es] not wish to be a

part of that." (ECF No. 75-3, at 2.) Rather, she stated that she is "trying to unlock the door,

caused by dyspraxia[,] that is keeping this young lady locked inside—when she has amazing

skills cognitively." (ECF No. 75-3, at 2.)

---

The Court takes judicial notice of this definition of IEP pursuant to Federal Rule of Evidence 201(b), which permits a court to take judicial notice of an adjudicative fact that is "not subject to reasonable dispute" because it "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

On December 4, 2020, S.P.'s IEP team met with Ms. Smith to review S.P.'s progress. (Smith Aff. ¶ 81.)  On December 14, 2020, Ms. Smith received by email a draft of S.P.'s proposed IEP.  (Smith Aff. ¶ 82.)  Approximately three weeks later, on January 8, 2021, Ms. Smith reviewed the proposed IEP from the December 4, 2020 meeting and advised the IEP team that she would provide comments and propose edits soon.  (Smith Aff. ¶ 83; *see also* Smith Aff. Attachment No. 5.)  On January 19, 2021, Ms. Smith sent the IEP team her comments and edits. (Smith Aff. ¶ 84; *see also* Smith Aff. Attachment No. 6.)  In her comments and edits, among other things, Ms. Smith noted that the assertion that the Rapid Prompting Method (RPM) or hand-over-hand assistance was being used with S.P. was factually inaccurate.  (Smith Aff. ¶ 84.) Ms. Smith clarified that S.P. received minimal wrist support for typing.  (Smith Aff. ¶ 84.)

On February 16, 2021, S.P.'s lead Special Education teacher forwarded an email to S.P.'s IEP team, including Ms. Smith, referencing the American Speech-Language-Hearing Association's "opinion statement" that "'Facilitated Communication (FC) is a discredited technique that should not be used.'"  (Smith Aff. ¶ 85; *see also* Smith Aff. Attachment No. 7.)

On April 1, 2021, the school issued an amended IEP which included a section entitled "Speech/Language Update March 2021" stating that

> *the communication method utilized by the parent and private home help of adult supported, hand under hand typing is identical to the unsupported communication method of Facilitation Communication (FC).*  The description of facilitated communication is "a technique that involves a person with a disability pointing to letters, pictures, or objects on a keyboard or on a communication board, typically with physical support from a 'facilitator.'  This physical support usually occurs on the hand, wrist, elbow, or shoulder (Biklen, Winston Morton, Gold, Berrigan, & Swaminathan, 1992) or on other parts of the body."  Facilitated communication is also referred to as 'Assisted Typing," "Facilitated Communications Training," and "Supported Typing."  (Lilienfield, Marshall, Todd, & Shane, 2014).

13

> This form of communication has not been scientifically supported and *without evidence of valid, authentic, and independent communications, the team must call into question the authorship of the messages being produced.*

(Smith Aff. Attachment No. 8 ("April 2021 IEP"), at 12, 14 (emphasis added); *see also* Smith Aff. ¶ 86.) The section also included a statement from the school's Speech Language Pathologist acknowledging that "[d]ecades of scientific research . . . have established with confidence that [facilitated communication] is not a valid form of communication; [m]essages produced using [facilitated communication] do not reflect the communication of the person with a disability; . . . and [the American Speech-Language-Hearing Association's] position on [facilitated communication] is that it should not be used." (April 2021 IEP, at 40; *see also* Smith Aff. ¶ 86.)

Ms. Smith avers that this April 2021 update was the first occasion on which anyone had suggested to her that the method by which S.P., then fourteen, was communicating was not a valid form of communication and that the messages being typed on S.P.'s iPad were not S.P.'s words. (Smith Aff. ¶ 87.)

### d.     Mr. Plantan Initially Praised S.P.'s Typing as "Amazing"

Mr. Plantan's belief in the legitimacy of S.P.'s typed communications has evolved over time. Prior to the December 20, 2020 sexual abuse allegations at the core of this case and discussed in detail later, Mr. Plantan repeatedly confirmed to Ms. Atkinson his belief that S.P. authored the typed communications. (*See* ECF No. 80-5, at 2 ("Plantan Depo. Tr."), at 54:1–56:4.) On November 16, 2020, Ms. Atkinson exchanged several emails with Mr. Plantan's email address. (ECF No. 80-4, at 4–5.) The first email, signed "Kevin Plantan", stated: "I saw [S.P.] Saturday and she wrote me an amazing letter. I was wondering if we could talk this week? I would like some help in writing to her and facetiming with her." (ECF No. 80-4, at 5.) The second email read: "Thank you Wendy. I can't possibly thank you enough for getting her to

type so well. . . . I'm not sure if you're familiar with the letter she wrote me on 11-13? I can

send a copy if you don't." (ECF No. 80-4, at 4.) On November 18, 2020, Ms. Atkinson received

an email from Mr. Plantan's email address that stated: "Ms. Wendy, THANK YOU for your

time today. I can never thank you enough for giving my daughter a voice." (ECF No. 80-4,

at 3.) On December 15, 2020 at 1:23:49 PM EST, Ms. Atkinson received another email from

Mr. Plantan's email address that stated: "I spoke with mom and she came over and helped [S.P.]

type Saturday. She has a lot to tell me, to say the least." (ECF No. 80-4, at 3.)

After hearing of the allegations S.P. typed *approximately one hour later that same day*,

however, Mr. Plantan began derogating the assistance S.P. receives as "facilitated

communication." (ECF No. 1 ¶ 24.) Mr. Plantan describes facilitated communication as a

"technique" that "involves the purported speaker . . . pointing to individual letters on a board via

assistance of another individual . . . as a means of spelling individual words" while the facilitator

"offers support via physical and verbal prompts," including "the physical touching and placing of

the speaker's fingers on the relevant letters." (ECF No. 1 ¶¶ 25–26.) Mr. Plantan then

denounces facilitated communication as "a disproven, controversial, nonscientific, unaccepted,

and unrecognized practice" that "does not involve reliable or credible communication with those

suffering from nonverbal autism." (ECF No. 1 ¶ 29.)

### 3. The December 15, 2020 Sexual Abuse Allegations and Ensuing Investigation

On December 15, 2020, S.P., then thirteen years old, was participating in her seventh-

grade online classes with one of her care attendants. (Smith Aff. ¶¶ 46, 58; Smith Depo. Tr., at

36:25–37:1; Mastrangeli Aff. ¶¶ 3, 5, 10; ECF No. 1 ¶¶ 38–39; Atkinson Depo. Tr., at 49:11–

22.) Around 2:30 p.m., the attendant, Ms. Olivia Mastrangeli, interrupted a Zoom meeting,

showed Ms. Smith S.P.'s iPad, and told her that S.P. had typed what was on the screen with Ms.

15

Mastrangeli providing wrist support. (Smith Aff. ¶¶ 59, 61–62; Mastrangeli Aff. ¶ 20.) The

screen contained allegations that Mr. Plantan had sexually abused S.P. (Smith Aff. ¶¶ 62–63 &

Attachment No. 3; Mastrangeli Aff. ¶ 18 & Exh. A).)

> The screen displayed the following words:
>
> I want to talk about my dad
> And talk about a lot of things.
> To you
>
> I feel angry all the time because my dad
> I want him to realize what he has done to me. I want him to
> apologize. That is really important to me. I deserve better than
> what he has done to me.
>
> Something else. I don't want to talk about it to anyone. I don't
> want to ever tell anyone. I am scared. I don't want to get in
> trouble. Yes ok thanks
>
> I am still angry. I am also a very smart and funny girl. And I don't
> believe him.
>
> I remember. And thanks. I feel better.
>
> Yes. I am still angry and that is bad.
> Yes. I am still scared. I don't want to see him anymore. I hate him.
> Yes. I am scared of getting in trouble.
>
> I hate my dad. For something else. He always gets a boner when
> I'm with him. Then he always always makes me uncomfortable by
> touching me. Just when it's not supervised
>
> Yes i feel comfortable talking to you.
>
> Not since I went to his house. Before Florida.[11]
>
> I am scared because he said not to tell anyone. He said not to tell
> anyone he touched my vagina and that if I did he would never visit
> again. He said that when I stayed at his house before Florida.
> Then he moved and forgot about me. He touched me every time I
> slept there. Yes I want to talk about it now. Then he came into me

---

[11] Mr. Plantan went to Florida in September 2019. (Smith Aff. ¶ 40.) Depending on her birthday, S.P. was either 11 or 12 years old at this time.

> room and had sex with me. I was so scared. I wanted to die. I
> wanted to never see him again. I hated him. I still hate him. That
> makes me feel guilty.
>
> I am scared every time I see him. I don't want him to visit
> anymore. I want mom to go to Florida and tell him to never come
> back.

(Smith Aff. ¶¶ 62–63 & Attachment No. 3; Mastrangeli Aff. ¶ 18 & Exh. A.)

Ms. Smith asked Ms. Mastrangeli to confirm with S.P. whether what S.P. had typed was true. (Smith Aff. ¶ 64; Mastrangeli Aff. ¶ 22.) Ms. Mastrangeli went back to S.P. and then returned with the iPad, reported that she had asked S.P. if what she had typed was true, and showed Ms. Smith the iPad and what she said S.P. had typed: "This is the truth." (Smith Aff. ¶¶ 65–67; Mastrangeli Aff. ¶¶ 23–25.) Ms. Smith believed "with certainty" that the words on the iPad were S.P.'s words and that what S.P. had typed was true. (Smith Aff. ¶ 68.)

After calming S.P., who was "running around the house hysterically sobbing and wailing," Ms. Smith contacted Virginia Podboy, who since 2016 had served as S.P.'s guardian *ad litem* in the Hanover County Juvenile and Domestic Relations District Court. (Smith Aff. ¶¶ 69–70; ECF No.78-4 ("Podboy Aff.") ¶¶ 3, 5–6.) Ms. Podboy was familiar with S.P.'s abilities and disabilities, having met her personally on multiple occasions and "having interviewed her parents, doctors, teachers[,] and various care providers." (Podboy Aff. ¶ 8.) Ms. Podboy also knew that S.P. typed with the assistance of a verbal partner and had witnessed this typing "on several occasions." (Podboy Aff. ¶ 9.) Ms. Smith read Ms. Podboy the typed communication and asked Ms. Podboy what she should do. (Smith Aff. ¶ 71; Podboy Aff. ¶ 7.) Ms. Podboy told Ms. Smith to let her think about it, and that she would call her back. (Podboy Aff. ¶ 10.) Ms. Podboy then called an attorney she knew in the Commonwealth Attorney's Office, relayed what Ms. Smith had told her, and asked what Ms. Smith should do. (Podboy Aff.

¶ 11.) Ms. Podboy called Ms. Smith back and told her to call the non-emergency telephone number for the Hanover County Sheriff's Department and report what had occurred. (Podboy Aff. ¶ 12; *see also* Smith Aff. ¶ 72.)

Ms. Smith did just that: she called the *non-emergency* telephone number for the Hanover County Sheriff's Department and reported what had occurred. (Smith Aff. ¶ 73; Smith Depo. Tr., at 47:8–15.)

In the evening on that same day, December 15, 2020, a deputy from the Hanover County Sheriff's Department[12] came to Ms. Smith's house. (Smith Aff. ¶ 75.) Ms. Smith shared a printed copy of what S.P. had typed regarding Mr. Plantan and a photograph of the screen of the iPad depicting what S.P. had typed. (Smith Aff. ¶ 75–76.) The next day, December 16, 2020, Investigator Troy Payne[13] with the Hanover County Sheriff's Department came to Ms. Smith's house and interviewed S.P. and Ms. Mastrangeli outside of Ms. Smith's presence. (Smith Aff. ¶ 77.) Investigator Payne opened an investigation of S.P.'s report that ultimately resulted in the issuance of felony criminal warrants against Mr. Plantan for two counts of rape and two counts of sodomy involving S.P. (ECF No. 1 ¶ 41.)

Ms. Atkinson was not present when the December 15, 2020 allegations were typed on S.P.'s iPad. (Atkinson Decl. ¶ 15.) Ms. Atkinson first learned of the December 15, 2020 allegations on December 17, 2020, when Ms. Smith informed Ms. Atkinson that Ms. Smith had contacted S.P.'s guardian *ad litem* about some information S.P. had typed. (Atkinson Decl. ¶¶

---

[12] The Hanover County Sheriff's Department was originally named as a defendant in this action, but the Court has since dismissed it as a party upon the defendant's motion for failure to state a claim upon which relief could be granted. (*See* ECF Nos. 1, 23, 41.)

[13] Investigator Troy Payne was originally named as a defendant in this action, but the Court has since dismissed him upon the defendant's motion for failure to state a claim upon which relief could be granted. (*See* ECF Nos. 1, 23, 41.)

15–16; Atkinson Depo. Tr., at 49:5–22; Smith Depo. Tr., at 83:5–85:10.)  Ms. Smith did not

share specifics with Ms. Atkinson at that time.  (Atkinson Decl. ¶¶ 15–16; Atkinson Depo. Tr., at

49:5–22; Smith Depo Tr., at 83:5–85:10.)  Subsequent to December 15, 2020, S.P. allegedly

repeated the accusations, including when typing with Ms. Atkinson.  (Atkinson Decl. ¶ 20.)

However, Ms. Atkinson did not report those subsequent allegations because "the allegations had

already been reported."  (Atkinson Decl. ¶ 20.)

Ms. Atkinson has never spoken with any representatives of the Hanover County Sheriff's

Department, detectives, or any other law enforcement representatives regarding the police

investigation of Mr. Plantan.  (Atkinson Decl. ¶ 13; Atkinson Depo. Tr., at 32:21–33:20, 50:11–

16.)  Further, Ms. Atkinson was never asked to share the contents of any documents that

contained S.P.'s typing with law enforcement personnel.  (Atkinson Decl. ¶ 13; Atkinson Depo.

Tr., at 52:3–16.)

Prior to the alleged disclosures on December 15, 2020, Ms. Smith had no reason to

suspect that any such conduct took place; no physical evidence or other corroborative evidence

existed beyond the typed words.  (Smith Depo. Tr., at 98:15–23.)  Ms. Smith acknowledges that

S.P. lacked formal sexual education.  (Smith Depo. Tr., at 50:19–51:12.)

### 4.  Mr. Plantan's Criminal Proceedings

After the investigation into the reported abuse, on January 9, 2021, the Hanover County

Sheriff's Department arrested Mr. Plantan.  (ECF No. 1 ¶¶ 44–45.)

On April 8, 2021, the Hanover Juvenile and Domestic Relations District Court conducted

a competency hearing and found that S.P., then fourteen years old, was competent and that the

use of physically aided communication in that case was "proper, appropriate, reliable, and

credible."  (ECF No. 75-4, at 2.)  Later, S.P. testified in court regarding allegations of abuse by

19

Mr. Plantan. (ECF No. 78-5, at 4 ("McElroy Aff.")[14] ¶¶ 13–15.) When S.P. testified at hearings, Ms. Mastrangeli—not Ms. Atkinson—assisted her typing. (Smith Depo. Tr., at 89:16–22, 130:7–16.) Ms. Mastrangeli wore headphones so that she could not hear the questions being asked while S.P. testified.[15] (Smith Depo. Tr., at 89:16–22, 130:7–16.)

Ms. Atkinson's only involvement with Mr. Plantan's criminal proceedings occurred when the Commonwealth's Attorney asked Ms. Atkinson to testify "regarding autism and dyspraxia, and [her] work with S.P. and [S.P.'s] motor skills" at Mr. Plantan's preliminary hearing in the Hanover Juvenile and Domestic Relations District Court. (Atkinson Decl. ¶ 14; Atkinson Depo. Tr., at 59:9–18; ECF No. 1 ¶ 59.) Ms. Atkinson "did not at any time discuss with [Ms.] Smith prior to the hearing the nature of her testimony . . . nor did they ever discuss together any plan to try and achieve Mr. Plantan's incarceration and/or conviction." (ECF No. 80, at 8 (citing Atkinson Decl. ¶ 21; Smith Depo. Tr., at 101:10–102:1).)

At the conclusion of the preliminary hearing in which S.P. and Ms. Atkinson testified, the court determined that probable cause existed to certify the charges against Mr. Plantan to the grand jury. (ECF No. 1 ¶ 59.) On June 15, 2021, the grand jury indicted Mr. Plantan on charges of rape and sodomy. (ECF No. 1 ¶ 60.) Mr. Plantan was held in jail for nearly ten months from January 9, 2021 until his release on November 5, 2021. (*See* ECF No. 1 ¶¶ 41–52, 60.)

After an October 19, 2021 pretrial hearing, the Hanover County Circuit Court judge "ordered a 'double blind' test" to determine the "validity and credibility of the . . .

---

[14] Sarah K. McElroy, Ph.D, LCP, is a licensed clinical psychologist who has provided outpatient psychotherapy services to S.P. since February 2021. (McElroy Aff. ¶¶ 3–5.)

[15] At oral argument, counsel for Mr. Plantan stated that he was not certain that Ms. Mastrangeli wore headphones and had not been able to confirm this assertion. However, Mr. Plantan does not offer any evidence to dispute this assertion and has not challenged this fact in a cognizable fashion. *See Mitchell*, 12 F.3d at 1316.

communication at issue." (ECF No. 1 ¶¶ 61, 63.)  Ms. Smith initially agreed to this "'double-blind' test" of S.P.'s communications, but on November 11, 2021, Ms. Smith informed the Hanover County Commonwealth's Attorney's Office that she would not permit S.P. to participate in the court-ordered evaluation.  (ECF No. 1 ¶ 67; *see also* McElroy Aff. ¶ 15.)  On November 23, 2021, upon the Commonwealth's motion to nolle prosequi the charges, the Circuit Court of the County of Hanover dismissed all charges against Mr. Plantan.  (ECF No. 1 ¶ 71.)

C.    **Procedural Background**

On June 1, 2022, Mr. Plantan sued Ms. Smith; the Hanover County Sheriff's Office and one of its sergeants; the Hanover County Department of Social Services and two of its social workers; the Cornerstone Defendants; and Ms. Mastrangeli and Ms. Whitlow.  (*See generally* ECF No. 1.)  The Court has dismissed from this action all defendants but Ms. Smith and the Cornerstone Defendants.  (*See* ECF Nos. 26, 32, 41.)

Only the malicious prosecution claim (Count III) and the IIED claim (Count V) remain against Ms. Smith, and only the malicious prosecution claim (Count III) remains against the Cornerstone Defendants.[16]  (ECF Nos. 41, 43.)

Regarding the malicious prosecution claims (Count III), Mr. Plantan asserts that the Cornerstone Defendants "acted in concert" with Ms. Smith "to intentionally report the purported allegations made by S.P. to . . . law enforcement agents[.]"  (ECF No. 1 ¶ 91.)  He further alleges that Ms. Smith knew "that facilitated communication was not recognized as a legitimate

---

[16] Mr. Plantain initially sued Ms. Smith and the Cornerstone Defendants, among others, for malicious prosecution (Count III) and false arrest (Count IV).  (ECF No. 1 ¶¶ 85–112.)  Mr. Plantan also sued Ms. Smith for intentional infliction of emotional distress ("IIED") (Count V) and abuse of process (Count VI).  (ECF No. 1 ¶¶ 113–130.)  Mr. Plantan also sued the Cornerstone Defendants, among others, for gross negligence (Count VII).  (ECF No. 1 ¶¶ 131–173.)  The Court previously dismissed Counts IV and VI against Ms. Smith, (ECF No. 43, at 1), and Counts IV and VII against the Cornerstone Defendants, (ECF No. 41, at 1).

practice" and knew or should have known that any information communicated through the practice "was not credible." (ECF No. 1 ¶¶ 100–01.) Regarding the IIED claim against Ms. Smith only (Count V), Mr. Plantan contends that "the procurement of facilitated communication for S.P. after knowing it relied on unacceptable or unrecognized procedures, and the subsequent reliance on such procedures when making reports to law enforcement, was intentional or reckless" and subjected Mr. Plantan to physical harm. (ECF No. 1 ¶¶ 113–19.)

On January 5, 2024, Ms. Smith and the Cornerstone Defendants filed their Motions for Summary Judgment. (ECF Nos. 77, 79.) Mr. Plantan responded, (ECF Nos. 84, 85), and Ms. Smith and the Cornerstone Defendants replied, (ECF Nos. 86, 91). The Cornerstone Defendants also filed a Motion to Strike Plaintiff's Opposition to Motion for Summary Judgment (the "Motion to Strike"), (ECF No. 88). On March 25, 2024, the Court denied the Motion to Strike and its accompanying Motion for Hearing, (ECF No. 90). (ECF Nos. 98–99.)[17]

-------

[17] In their Reply brief and at oral argument, the Cornerstone Defendants argue that Mr. Plantan's opposition brief fails to comply with Federal Rule of Civil Procedure 56 because it fails to "cit[e] to particular parts of materials in the record" to support any assertion that a fact cannot be or is genuinely disputed. (ECF No. 91, at 2 (citing Fed. R. Civ. P. 56).) Similarly, the Cornerstone Defendants allege that Mr. Plantan's opposition fails to comply with Eastern District of Virginia Local Rule 56, because it does not "'include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute.'" (ECF No. 91, at 2 (quoting E.D. Va. Loc. Civ. R. 56).)

Mr. Plantan's opposition briefing cites only occasionally and vaguely to the record in a manner that arguably does not comply with Federal Rule 56 and certainly runs afoul of Local Rule 56. Mr. Plantan does not "include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated." *See* E.D. Va. Loc. Civ. R. 56. Summary judgment could be granted in favor of the Cornerstone Defendants on that basis alone. However, the Court *sua sponte* examines Mr. Plantan's arguments and the record to discern whether he raises a genuine dispute as to any material fact. Thus, the Court's assessment of the propriety of summary judgment does not turn on a procedural default, but rather rests on an independent evaluation of the merits of the dispute.

## II. Standard of Review: Summary Judgment

Summary judgment under Rule 56[18] is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but instead must set forth specific facts illustrating genuine issues for trial. *Celotex Corp.*, 477 U.S. at 322–24. These facts must be presented in the form of stipulations, exhibits, and sworn affidavits or declarations. Fed. R. Civ. P. 56(c).[19] Moreover, the facts

---

The Cornerstone Defendants next repeat the argument raised in their Motion to Strike, (ECF No. 88), that Mr. Plantan transgressed this Court's Amended Pretrial Scheduling Order by filing just before midnight rather than just before 5:00 p.m. on the date of the filing deadline. (ECF No. 91, at 1, 3–4.) The Court refers to and incorporates by reference its previously issued Memorandum Opinion and Order denying the Motion to Strike. (ECF Nos. 98, 99.)

[18] Rule 56(a) provides:

(a) MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT. A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).

[19] Rule 56(c) states, in pertinent part:

(c) PROCEDURES.

(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

23

offered by a sworn declaration must also be in the form of admissible evidence, meaning the statements in the sworn declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Therefore, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (internal citations omitted).

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995). Nonetheless, the nonmoving "party is entitled 'to have the credibility of [its] evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). However, "'there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed.'" *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). Thus, "the nonmoving party must rely on more than conclusory allegations, 'mere speculation,' the

---

> (A) citing to particular parts of materials in the record, including depositions, documents, . . . affidavits or declarations, stipulations (including those made for purposes of the motion only), . . . or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).

'building of one inference upon another,' the 'mere existence of a scintilla of evidence,' or the appearance of 'some metaphysical doubt.'" *Lamar v. Ebert*, No. 2:12cv706 (HCM), 2018 WL 11463829, at *3 (E.D. Va. Mar. 20, 2018) (quoting *Anderson*, 477 U.S. at 252; *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002); *Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 330 F. Supp. 2d 688, 671 (E.D. Va. 2004)).

At this stage, the Court is tasked with assessing whether a plaintiff "has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *Celotex Corp.*, 477 U.S. at 324. Further, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Ultimately, the court must adhere to the affirmative obligation to bar factually unsupportable claims from proceeding to trial. *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex Corp.*, 477 U.S. at 323–24).

### III. Analysis

The Cornerstone Defendants move for summary judgment on the remaining claim against them: malicious prosecution (Count III). (ECF No. 80; ECF No. 1 ¶¶ 85–102.) Ms. Smith moves for summary judgment on both remaining Counts against her: malicious prosecution (Count III) and IIED (Count V). (ECF No. 78; ECF No. 1 ¶¶ 85–102, 113–22.) For the reasons articulated below, the Court will grant all motions. Even viewing the record as a whole and in the light most favorable to Mr. Plantan, Mr. Plantan has identified no admissible evidence that

would allow a reasonable inference that the defendants acted with malice and without probable cause, or in an outrageous and intolerable manner, as required under the law.  The Court addresses each count in turn, beginning with the malicious prosecution claim against the Cornerstone Defendants (Count III).

### A.   Mr. Plantan Does Not Present a Genuine Issue of Material Fact Sufficient to Sustain a Claim of Malicious Prosecution Against the Cornerstone Defendants (Count III)

The Court concludes that Mr. Plantan has failed to set forth evidence in the form of specific facts that the Cornerstone Defendants engaged in malicious prosecution.  Critically, Mr. Plantan does not articulate any admissible evidence to rebut the Cornerstone Defendants' evidence that they neither instituted nor cooperated in the prosecution of Mr. Plantan.  Indeed, Mr. Plantan adds nothing to the record suggesting that the Cornerstone Defendants did not believe in the substantive validity of S.P.'s typed communications.  Because, even viewing the record as a whole and in the light most favorable to Mr. Plantan, Mr. Plantan has not adduced evidence from which a reasonable jury could find that the Cornerstone Defendants either instituted or cooperated in the prosecution of Mr. Plantan or acted maliciously in so doing, the malicious prosecution claim against the Cornerstone Defendants fails as a matter of law.

### 1.   Legal Standard:  Malicious Prosecution

To state a claim for malicious prosecution under Virginia law, the plaintiff has the burden to prove that "'the prosecution was (1) malicious, (2) instituted by or with the cooperation of the defendant, (3) without probable cause, and (4) terminated in a manner not unfavorable to the plaintiff.'" *Bennett v. R & L Carriers Shared Servs., LLC*, 492 F. App'x 315, 316 (4th Cir. 2012) (quoting *Reilly v. Shepherd*, 643 S.E.2d 216, 218 (Va. 2007)).

"In Virginia, 'malice' means 'any controlling motive other than a good faith desire to further the ends of justice, enforce obedience to the criminal laws, suppress crime, or see that the guilty are punished.'" *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 756 (E.D. Va. 2016) (quoting *Hudson v. Lanier*, 497 S.E.2d 471, 473 (Va. 1998)). "'[T]he fact that [a malicious prosecution plaintiff does] not label and identify explicitly an alleged improver motive . . . is of no consequence.  The Court is not aware of any authority that requires otherwise.'" *Id.* (quoting *Bennett v. R & L Carriers Shared Servs., LLC*, 744 F. Supp. 2d 494, 521–24 (E.D. Va. 2010) *aff'd*, 492 F. App'x 315 (4th Cir. 2012)) (second and third alteration in original).

To determine that the prosecution was "instituted by or with the cooperation of the defendant, . . . the Court must ascertain whether a defendant affirmatively, actively, and voluntarily took steps to instigate or to participate in the arrest of the [plaintiff] and whether the defendant exercised some level of control over the decision to have the plaintiff arrested." *Id.* at 763 (quoting *Bennett*, 744 F. Supp. 2d at 511–12) (internal quotation marks omitted). "'A defendant instigates or cooperates in the proceedings by either taking the original steps to initiate the proceeding . . . or by subsequently adopting and ratifying the steps that others have already taken to initiate proceedings.'" *Id.* (quoting *Bennett*, 744 F. Supp. 2d at 763). While "a witness who provides the police with incorrect information during a criminal investigation [does not] ipso facto 'institute[]' or 'procure[]' the prosecution if he provides that information unequivocally[,] . . . the critical question is whether the witness provided the police with his [or her] honest or good faith belief of the facts." *Brice v. Nkaru*, 220 F.3d 233, 238 (4th Cir. 2000) (citing *King v. Martin*, 142 S.E. 358, 361 (Va. 1928)); *see also King*, 142 S.E. at 361 (distinguishing between the actions of a witness who acted in good faith and was thus shielded from civil liability from those of a witness reporting with questionable truthfulness).

27

"In Virginia, in the context of a malicious prosecution action, probable cause is defined as 'knowledge of such facts and circumstances to raise the belief in a reasonable mind, acting on those facts and circumstances, that the plaintiff is guilty of the crime of which he [or she] is suspected.'" *Bennett*, 492 F. App'x at 324 (quoting *Andrews v. Ring*, 585 S.E.2d 780, 786 (Va. 2003)). "The determination whether a defendant [in a malicious prosecution claim] had probable cause to believe that a crime was committed is judged with reference to the time the defendant took the action initiating the criminal charges." *Andrews*, 585 S.E.2d at 786.

> [W]hen a defendant, in initiating a prosecution, acts in good faith upon the advice of reputable counsel, after a full disclosure of all material facts, he [or she] has probable cause to support his [or her] action. Probable cause serves as a complete defense to an action for malicious prosecution, even if the advice given by the attorney is wrong. The defendant must prove that he [or she] sought advice of counsel with an honest purpose of being informed of the law, that he [or she] made a full, correct, and honest disclosure of all material facts known to him [or her] or which he [or she] should reasonably have known, and that he [or she] acted in good faith guided by the advice given by counsel. This defense usually presents a jury question unless reasonable minds cannot differ that advice of counsel has been established.

*Id.* (quoting *Pallas v. Zaharopoulos*, 250 S.E.2d 357, 359–60 (Va. 1979) (internal quotation marks and citations omitted); *see also Noell v. Angle*, 231 S.E.2d 330, 333 (Va. 1977) (affirming district court's finding that "probable cause for initiating the criminal proceeding existed as a matter of law" because "defendants acted on advice of counsel after 'a full and complete and honest disclosure' of the relevant facts").

### 2. Mr. Plantan Has Not Created a Genuine Dispute as to Whether the Prosecution Was Instituted by, or with the Cooperation of, the Cornerstone Defendants

The Court addresses the second element of a malicious prosecution claim first because it is dispositive. As to this element, the Court determines whether the prosecution was "instituted by or with the cooperation of" the Cornerstone Defendants. *See Bennett*, 492 F. App'x at 316.

At the motion to dismiss stage, the Court concluded that "[a]s a facilitator, witness, and reporter of the alleged allegations made by [S.P.], the Cornerstone Defendants 'ipso facto institute[d] or procure[d] the prosecution.'"  (ECF No. 40, at 24 (quoting *Brice*, 220 F.3d at 238 (internal quotation marks omitted)).)

Subsequent discovery in this case undermines the allegations in Mr. Plantan's Complaint which this Court necessarily relied upon at the motion to dismiss stage.  First, the uncontroverted evidence shows that the Cornerstone Defendants were not a "facilitator, witness, [or] reporter of the alleged allegations made by S.P."  (*See* ECF No. 40, at 24 (quoting *Brice*, 220 F.3d at 238 (internal quotation marks omitted)).)   Ms. Mastrangeli, not Ms. Atkinson, was typing with S.P. on December 15, 2020.  (ECF No. 78, at 7; ECF No. 80, at 6.)  Although Ms. Mastrangeli worked as an independent contractor for Cornerstone at that time with *other* patients, discovery has revealed that Ms. Mastrangeli never provided services to S.P. through Cornerstone at any time in any capacity.  (Atkinson Decl. ¶¶ 7, 9.)  Rather, Ms. Smith independently hired Ms. Mastrangeli to provide in-home respite services and specifically to help S.P. with school-related tasks.  (Atkinson Decl. ¶¶ 10, 12.)[20]

Ms. Atkinson was not present when the allegations were typed on December 15, 2020. (Atkinson Decl. ¶ 15.)  Indeed, Ms. Atkinson was not even aware of the allegations until, at the earliest, two days later, on December 17, 2020, by which time Ms. Smith had already reported them to law enforcement.  (Atkinson Decl. ¶ 16; Smith Depo. Tr., at 83:5–85:24.)  Investigator Payne had already begun his investigation.  (Atkinson Depo. Tr., at 49:5–50:10; Smith Depo. Tr., at 83:5–85:10.)  It was not until S.P. allegedly disclosed directly to Ms. Atkinson on or about

---

[20] The Court addresses Mr. Plantan's arguments that the Cornerstone Defendants are vicariously liable in detail in Part III.A.3, *infra*.

December 31, 2020, that Ms. Atkinson could plausibly facilitate, witness, or report the allegations. (Atkinson Depo. Tr., at 44:21–45:10.) Ms. Atkinson avers, and Mr. Plantan does not contest, that she did not report these disclosures to law enforcement because by that point, the investigation was already under way. (Atkinson Decl. ¶ 20.)

The uncontroverted evidence further establishes that Ms. Atkinson never reported sexual abuse allegations to law enforcement, (Atkinson Decl. ¶ 20), never spoke with law enforcement regarding Mr. Plantan's criminal investigation, (Atkinson Decl. ¶ 13; Atkinson Depo. Tr., at 32:21–33:20, 50:11–16), and was never asked to provide any document containing S.P.'s typing to law enforcement personnel, (Atkinson Decl. ¶ 13; Atkinson Depo. Tr., at 52:3–16).

In briefing and at oral argument, Mr. Plantan argues that the Cornerstone Defendants nonetheless facilitated the alleged disclosure because Ms. Atkinson taught others the method of assisted typing that he characterizes as facilitated communication. (ECF No. 85, at 2.) Because Ms. Atkinson introduced the technique of assisted typing with S.P., the theory goes, she necessarily cooperates in any subsequent actions others take on the basis of any of the resulting typed communications.[21]

However, no evidence in the record permits a reasonable inference that Ms. Atkinson taught Ms. Mastrangeli any typing method, let alone with the goal of eliciting a faulty allegation against Mr. Plantan. The closest the record comes to supporting this claim is Ms. Smith's deposition testimony that Ms. Mastrangeli learned how to assist S.P.'s typing by observing Ms. Whitlow, who had learned by observing Ms. Smith, who in turn had learned this technique of providing minimal wrist support from Ms. Atkinson. (Smith Depo. Tr., at 70:11–71:1.)

---

[21] At oral argument, counsel for Mr. Plantan acknowledged that this theory reflects "a unique application of malicious prosecution" that is "not traditional."

However, even assuming this attenuated chain of inferences built on other inferences, *see Lamar*, 2018 WL 11463829, at *3, could sufficiently establish that Ms. Atkinson "taught" Ms. Mastrangeli this technique by proxy, the Court does not see a basis on which to find that the Cornerstone Defendants participated in the decision to report or the subsequent prosecution merely because the alleged allegations occurred by virtue of this contested means of typed communication.  This does not rise to the "level of control" necessary to constitute participation in a malicious prosecution.  *See Daniczek*, 156 F. Supp. 3d at 763.

Although he appears to concede that Ms. Atkinson never reported to law enforcement directly, Mr. Plantan also urges that she participated in the prosecution because she informed Ms. Smith of the allegations with knowledge that Ms. Smith had *earlier* reported allegations to law enforcement.  (ECF No. 85, at 2.)  This disclosure from a care provider of a minor patient to the minor patient's parent simply does not rise to the "level of control" necessary to find active participation in the prosecution.  *See Daniczek*, 156 F. Supp. 3d at 763 (inquiry asks "whether the defendant exercised some level of control over the decision to have the plaintiff arrested") (quoting *Bennett*, 744 F. Supp. 2d at 511–12) (internal quotation marks omitted).  This is particularly true because Ms. Atkinson attests that "anytime that a client reports anything that is in any way detrimental or hurtful to them, we are required to report it to the parents."  (Atkinson Depo. Tr., at 89:17–19.)

Thus, the inference Mr. Plantan asks the Court to draw—*i.e.*, that Ms. Atkinson reported the subsequent allegations to Ms. Smith as a means of participating in the prosecution of Mr. Plantan—is unreasonable in light of the competing inference drawn from her reporting obligations as a care provider to a minor child, especially when these reports occurred after the

sheriff's office had begun its investigation and where Ms. Atkinson never spoke directly with the sheriff's office.[22] *See Sylvia Dev. Corp.*, 48 F.3d at 818.

Finally, Mr. Plantan proposes, without any citation to case law, that Ms. Atkinson's participation as a witness at a preliminary hearing during Mr. Plantan's criminal proceedings, at the express request of the Commonwealth Attorney's Office, constitutes cooperation in the prosecution. (*See generally* ECF No. 85, at 2–3.) The Cornerstone Defendants in response cite case law providing that even "a witness who provides the police with *incorrect* information during a criminal investigation [does not] ipso facto 'institute[]' or 'procure[]' the prosecution," and that "the critical question is whether the witness provided the[] police with his [or her] honest or good faith belief in the facts." (ECF No. 91, at 11 (quoting *Brice*, 220 F.3d at 238) (internal quotation marks omitted) (emphasis added).) The Cornerstone Defendants urge that, to the extent the Court construes Ms. Atkinson's testimony at the preliminary hearing as adopting or ratifying the prosecution, she provided "her 'honest or good faith belief of the facts' – facts about S.P.'s motor abilities, autism, and dyspraxia, as she was sworn to do."[23] (ECF No. 91, at 12.) Even viewing the record as a whole in the light most favorable to Mr. Plantan, Mr. Plantan does not suggest that Ms. Atkinson's testimony at the hearing was anything other than "[her] honest or good faith belief in the facts," *see Brice*, 220 F.3d at 238, and the Court concludes that such testimony—which had nothing to do with the allegations and concerned only

---

[22] Although Mr. Plantan is entitled to have reasonable inferences drawn in his favor at this stage in the proceedings, whether the inference is reasonable must be considered in conjunction with competing inferences to the contrary. *See Sylvia Dev. Corp.*, 48 F.3d at 818.

[23] At oral argument, counsel for Cornerstone Defendants could not confirm whether this testimony was offered in response to a subpoena. However, the Cornerstone Defendants attest that whether or not there was a subpoena, this testimony amounts to only minimal involvement in the criminal proceedings against Mr. Plantan.

"S.P.'s motor abilities, autism, and dyspraxia", (*see* ECF No. 91, at 12)—does not qualify as ratifying or adopting a prosecution. *See Daniczek*, 156 F. Supp. 3d at 763. Thus, considering the standard the Court applies for summary judgment purposes, Mr. Plantan has not created any genuine dispute as to whether the prosecution was initiated by or with the cooperation or the Cornerstone Defendants. *See Bennett*, 492 F. App'x at 316.

### 3.    Mr. Plantan Has Not Established a Genuine Dispute of Material Fact as to Vicarious Liability of the Cornerstone Defendants

In his briefing, Mr. Plantan asserts that vicarious liability remains an issue for trial because "[Ms.] Mastrangeli was an employee of Cornerstone during the relevant timeframe . . . , proceeded to discuss allegations about Mr. Plantan to [Ms.] Atkinson in [Ms.] Atkinson's role as [Ms.] Mastrangeli's 'boss'", and "assist[ed] S.P. with 'supported typing' or facilitated communication in the same manner employed by [the Cornerstone Defendants]." (ECF No. 85, at 6.) He cites no case law in support of this assertion. (*See* ECF No. 85, at 6.) At oral argument, Mr. Plantan averred that even if Ms. Mastrangeli was not employed by Cornerstone to perform services by S.P., she was nevertheless an "agent" of Cornerstone advancing Cornerstone's interest by working for Ms. Smith to develop a permanent, lasting, paying relationship with Ms. Smith.

The Cornerstone Defendants respond that "an employer is only liable for the tortious acts of its employee 'if the employee was performing his employer's business and acting with the scope of his [or her] employment when the tortious acts were committed.'" (ECF No. 91, at 17–18 (quoting *Garnett v. Remedi Seniorcare of Va., LLC*, 892 F.3d 140, 145 (4th Cir. 2018) (quoting *Plummer v. Ctr. Psychiatrists, Ltd.*, 476 S.E.2d 172, 174 (1996))).) The Cornerstone Defendants observe that neither Ms. Whitlow nor Ms. Mastrangeli was performing Cornerstone business or acting within the scope of their employment in their work with S.P. because only Ms.

Atkinson worked with S.P. on behalf of Cornerstone. (ECF No. 91, at 17.) Thus, the

Cornerstone Defendants conclude that "*respondeat superior* liability . . . cannot be and is not

established." (ECF No. 91, at 18.)

Because, even viewing the record as a whole and in the light most favorable to Mr.

Plantan, the undisputed record establishes that Ms. Mastrangeli and Ms. Whitlow, as contractors

directly employed by Ms. Smith, were neither performing Cornerstone's business nor acting

within the scope of their employment with Cornerstone when working with S.P., Mr. Plantan has

failed to create a genuine dispute regarding the existence of vicarious liability of Cornerstone for

any actions taken by Ms. Mastrangeli or Ms. Whitlow.

<strong>a.</strong>      <u><strong>Legal Standard:  Vicarious Liability</strong></u>

Virginia law defines the limits to the doctrine of *respondeat superior* clearly. *Garnett*,

892 F.3d at 145. An employer is only liable for the tortious acts of its employee "'if the

employee was performing his [or her] employer's business and acting within the scope of his [or

her] employment when the tortious acts were committed.'" *Id.* (quoting *Plummer*, 476 S.E.2d

at 174). "In other words, there must be a nexus between the employee's workplace

responsibilities and the offensive act." *Id.* "[A]n employee's act falls within the scope of his [or

her] employment only if (1) the act 'was expressly or impliedly directed by the employer, or is

naturally incident to the business, and (2) it was performed . . . with the intent to further the

employer's interest.'" *Id.* (quoting *Kensington Assocs. v. West*, 362 S.E.2d 900, 901 (1987)). "It

is well established that the simple fact that an employee is at a particular location at a specific

time as a result of his [or her] employment is not sufficient to impose *respondeat superior*

liability on the employer." *Lacasse v. Didlake, Inc.*, 712 F. App'x 231, 235 (4th Cir. 2018)

34

(quoting *Blair v. Def. Servs., Inc.*, 386 F.3d 623, 627 (4th Cir. 2004)) (internal quotation marks omitted).

>    **b.**    **Mr. Plantan Has Not Established a Genuine Dispute Regarding Vicarious Liability Because Ms. Mastrangeli and Ms. Whitlow Never Worked with S.P. as Cornerstone Employees, Ms. Atkinson Never Discussed the Allegations with Them, and Ms. Atkinson Did Not Teach Them How to Assist S.P.'s Typing**

Even viewing the record as a whole and in the light most favorable to Mr. Plantan, the record cannot support a finding of vicarious liability as a matter of law.  First, the mere undisputed fact of Ms. Mastrangeli and Ms. Whitlow's contemporaneous employment with Cornerstone with respect to *other* patients—which is not disputed—is irrelevant.  The uncontradicted evidence establishes that Ms. Mastrangeli and Ms. Whitlow never worked with S.P. in their capacities as Cornerstone employees.  (Atkinson Decl. ¶¶ 7, 9–10, 12); *see Garnett*, 892 F.3d at 145 (vicarious liability attaches only "if the employee was performing his [or her] employer's business and acting within the scope of his [or her] employment when the tortious acts were committed").

Second, Mr. Plantan mischaracterizes the record when he states that Ms. Mastrangeli discussed allegations about Mr. Plantan to Ms. Atkinson in Ms. Atkinson's role as Ms. Mastrangeli's "boss."  (ECF No. 85, at 6.)  In fact, Ms. Atkinson attested that she did *not* speak with Ms. Mastrangeli or Ms. Whitlow about the allegations.[24]  Mr. Plantan identifies no admissible evidence that Ms. Atkinson spoke with Ms. Mastrangeli or Ms. Whitlow about the

---

[24] Specifically, "[Ms. Atkinson] told the staff that it wasn't something that [they] were going to speak about because [Ms. Atkinson] felt like it was a legal matter."  (Atkinson Depo. Tr., at 47:12–17.)  Although she acknowledged that Ms. Mastrangeli "probably told [her] . . . as her boss," she states that she does not remember and that Ms. Mastrangeli "may not have."  (Atkinson Depo. Tr., at 48:20–49:1.)  Ms. Atkinson's hypothetical musings do not create a reasonable inference sufficient to draw the conclusion Mr. Plantan advances.

allegations. *See Mitchell*, 12 F.3d at 1316. On summary judgment the Court cannot accept "conclusory allegations", *see Lamar*, 2018 WL 11463829, at *3, because the Court has an affirmative obligation to bar factually unsupportable claims from proceeding to trial, *see Felty*, 818 F.2d at 1128. Regardless, an *ex post facto* discussion of the allegations, even presuming one had occurred, would not create vicarious liability where Ms. Mastrangeli or Ms. Whitlow's actions of assisting S.P. with typing were not undertaken while performing Cornerstone's business and therefore within the scope of their employment with Cornerstone. *See Garnett*, 892 F.3d at 145.

Third, the uncontradicted evidence suggests that Ms. Atkinson did not show Ms. Mastrangeli or Ms. Whitlow how to assist S.P. with typing; rather, Ms. Mastrangeli "observed [Ms. Whitlow] and [S.P.] communicating together, and [Ms. Mastrangeli] tried it and they picked right up on it." (Smith Depo. Tr., at 70:11–16.) Thus, that Ms. Mastrangeli, as Mr. Plantan says, "assist[ed] S.P. with 'supported typing' or facilitated communication in the same manner employed by [the Cornerstone Defendants]", (*see* ECF No. 85, at 6), does not suffice to reasonably infer vicarious liability where the evidence establishes that the Cornerstone Defendants did not teach Ms. Mastrangeli how to type with S.P. And, again, even had Ms. Atkinson taught Ms. Mastrangeli the method of typing she used with S.P., that would not create vicarious liability where the record plainly shows that Ms. Mastrangeli was working with S.P. as an independent contractor employed by Ms. Smith, not in her capacity as a Cornerstone employee, especially because Ms. Atkinson, for professional reasons, declined to discuss the allegations with Ms. Mastrangeli or Ms. Whitlow. (Atkinson Decl. ¶¶ 7, 9–10, 12; Atkinson Depo. Tr., at 47:12–17, 48:20–49:1.)

Because the record contradicts and case law forecloses all three arguments Mr. Plantan raises to create a dispute as to vicarious liability, Mr. Plantan cannot establish vicarious liability of the Cornerstone Defendants as a matter of law. This is so even if Ms. Mastrangeli or Ms. Whitlow were liable to Mr. Plantan for malicious prosecution, false arrest, or gross negligence, (*see* ECF No. 1, at 13, 16, 20), which he also has not established.

Because, even viewing the record as a whole and in the light most favorable to Mr. Plantan, Mr. Plantan has not identified any affirmative, active, or voluntary steps from which a factfinder could conclude that the Cornerstone Defendants instituted or cooperated in the prosecution, either directly or via vicarious liability, summary judgment in favor of the Cornerstone Defendants on the malicious prosecution claim (Count III) will be granted. Nevertheless, in the interest of creating a full record, the Court addresses whether Mr. Plantan has created a genuine dispute regarding another element of malicious prosecution: malice.

### 4. Mr. Plantan Has Not Created a Genuine Dispute that the Cornerstone Defendants Acted Maliciously

In the previously issued Memorandum Opinion denying the Motion to Dismiss as to Count III (Malicious Prosecution) against the Cornerstone Defendants, the Court concluded that, because it must view all facts asserted by Mr. Plantan as true and Mr. Plantan's Complaint asserted that S.P. "does not speak through facilitated communication at all", he had sufficiently alleged that it was the Cornerstone Defendants, rather than S.P., who authored the claims of sexual assault. (ECF No. 40, at 26–27.) The Court determined that the possibility that the Cornerstone Defendants authored the claims and falsely claimed that S.P. had authored them could "establish malice." (ECF No. 40, at 27.) Subsequent discovery in this case undercuts this possibility.

a. **The Undisputed Evidence Establishes that the Cornerstone Defendants Did Not Believe That They Were Using Facilitated Communication**

The Cornerstone Defendants do not argue the benefits of facilitated communication. The Cornerstone Defendants have put forth ample evidence, including at oral argument, that they did not and do not understand their method of typing to constitute "facilitated communication." (Atkinson Depo. Tr., at 45:22–46:6, 63:13–64:11, 73:6–75:7, 76:18–77:2, 77:18 ("I'm not assessing her communication skills."), 78:18–20 ("I did not intend it to be a communication method that she just jumped on as an individual herself, but she's a bright young lady."), 79:15–17 (recounting how the school "called it facilitated communication rather than motor skill development"), 80:2–5 ("She's typing these words. She's saying things that I would never even think to say. It's nothing to do with facilitated communication."), 83:13–16, 85:9–86:3.) In rebuttal, Mr. Plantan offers no evidence.[25]

For example, in her deposition Ms. Atkinson clarified that she views her typing work with S.P. as "motor skill development" that has "nothing to do with facilitated communication," and that she originally "did not intend it to be a communication method" but now believes that S.P. is "typing these words" and "saying things that [Ms. Atkinson] would never even think to say." (Atkinson Depo. Tr., at 78:18–20, 79:15–17, 80:2–5.) The following exchange is illustrative:

> Q:    Do you think she's communicating more clearly through the work you're doing?

---

[25] Again, Mr. Plantan designated an expert, Dr. Todd, whose testimony would have attempted to counter this evidence by stating that, even if Ms. Atkinson did not think she was using facilitated communication, she was, and that she disregarded the scientific consensus in so doing. But the Court was constrained to exclude Dr. Todd's testimony because by, among other things, rendering an opinion about this case without sufficient facts or data pertinent to the case at bar, it failed to meet the requirements for expert testimony as set out in Federal Rule of Evidence 702. (*See generally* ECF No. 102.)

A:   I do think she is communicating more clearly.  Now, can I say for absolute
     sure that it's her words with evidence-based practice behind it, no, because
     people are going to say it's facilitated communication.  But can I say
     because she's pulling my hand and typing it and I am not and she's saying
     things -- you know, when she's mad at me, "F you," yeah, it's her.
     There's no doubt in my mind.  When she's angry, she says it.  When she's
     frustrated, she says it.  When she doesn't want to be on topic, she says it.
     They're not something I've made up in my brain is what I'm saying.

Q:   I understand.

A:   As a professional who has worked with people with autism for a very,
     very long time, there's no doubt in my mind that these are her words,
     because I am not typing them, and because she's typing these with
     multiple people across multiple settings.

(Atkinson Depo. Tr., at 85:9–86:3.)  Mr. Plantan does not counter these sworn statements with

any admissible evidence from which a jury could conclude that the Cornerstone Defendants

acted maliciously.  *See Mitchell*, 12 F.3d at 1316.

At oral argument, counsel for Mr. Plantan took issue with the purported contradiction that

the Cornerstone Defendants did not believe they were engaged in facilitated communication yet

did believe that the words typed reflected S.P.'s words.  According to Mr. Plantan, the two

beliefs are irreconcilable.  But the record demonstrates otherwise.  For instance, S.P. typed with

"multiple people across multiple settings," (Atkinson Depo. Tr., at 86:2–3), and no school or

other party doubted its authenticity until the end of 2020.  At that point, S.P. had already been

keyboarding in some form or another for approximately five years.  (*See* Smith Aff. ¶ 24 (stating

that S.P. began keyboarding in 2015).)  Mr. Plantan's proffered inference from purported

contradiction is simply unreasonable in light of competing inferences to the contrary, such as the

one provided by Ms. Atkinson's sworn testimony quoted above that others had similar

experiences with S.P. and she did not doubt that she was hearing S.P.'s voice.  (Atkinson Depo.

Tr., at 85:9–86:3); *see Sylvia Dev. Corp.*, 48 F.3d at 818.  Mr. Plantan's insistence on his single

interpretation does not create a genuine dispute, but instead borders on the sort of "conclusory allegations[ and] 'mere speculation'" that are disallowed at summary judgment. *See Lamar*, 2018 WL 11463829, at *3 (quotations omitted).

The Court does not decide the legitimacy or authorship of these communications, nor can it on this record. The typed communications at issue in this case may or may not constitute facilitated communication. That would present a fact question for the jury to determine at trial. That factual determination, though, is irrelevant to the summary judgment question of whether, viewing the record as a whole and in the light most favorable to Mr. Plantan, Mr. Plantan has created a genuine dispute, "in the form of *admissible* evidence," that the Cornerstone Defendants acted with malice. *See Mitchell*, 12 F.3d at 1316 (emphasis added). He has not.

> **b.    The Undisputed Evidence Establishes that Mr. Plantan Shared a Belief that S.P.'s Voice Was in the Typed Communications Even One Hour Before the Allegations Against Him Were Made**

Mr. Plantan's shared belief that S.P. authored the typed communications as of the *very same day* that Ms. Smith reported the allegations to law enforcement patently contradicts his assertion that the Cornerstone Defendants acted with malice by believing them. The Court's previously issued Memorandum Opinion noted in a footnote that "[Mr.] Plantan's understanding of facilitated communication at the time of his arrest in 2019 does not necessarily reflect his understanding at the time of the filing of his [C]omplaint in 2022." (ECF No. 40, at 27 n.23.) This is true. However, ultimately the *defendants'* understanding of facilitated communication, not Mr. Plantan's, informs the malice inquiry here.

To the extent that *Mr. Plantan's* belief has any bearing on the reasonableness of defendants' belief in the legitimacy of the allegations, it actually *undermines* his argument that the defendants should have known that the typed communications were untrustworthy. The

uncontroverted evidence shows that Mr. Plantan *himself* believed that the typed communications were S.P.'s words up until the very afternoon that those typed communications accused him of sexual abuse. (*See* ECF No. 80-4, at 3.)  In November and December 2020, Mr. Plantan sent a series of emails to Ms. Atkinson in which he repeatedly thanked Ms. Atkinson for giving his daughter "a voice", noting that "she has a lot to tell [him]" and that she "wrote [him] an amazing letter." (ECF No. 80-4, at 3–5.)  One of these emails was sent on December 15, 2020, at 1:23:49 PM EST, the *same day* that Ms. Smith reported the typed allegations to law enforcement, and approximately one hour before Ms. Mastrangeli interrupted Ms. Smith's meeting to inform her of the typed allegations. (ECF No. 80-4, at 3; Smith Aff. ¶¶ 59, 61–62; Mastrangeli Aff. ¶ 20.)

At oral argument, Mr. Plantan's counsel advanced a distinction between believing it is S.P.'s voice "at home" and believing something enough to report it to law enforcement.  He argued that while it is appropriate to believe in her voice "at home", to report the content of her communications to law enforcement creates a triable issue about malice.  This supposed distinction is nothing more than speculative or theoretical at best, and not even a scintilla of evidence supports it. *See Lamar*, 2018 WL 11463829, at *3 (citations omitted).  It does not create a triable inference of malice in light of the evidence produced in this case, which—even viewing the record as a whole and in the light most favorable to Mr. Plantan—shows that *all* parties, including Mr. Plantan, believed in the typed communications' legitimacy at least up until the allegations of December 15, 2020. *See Sylvia Dev. Corp.*, 48 F.3d at 818.

   **c.**  **Mr. Plantan's Purported Inference of Malice Due to a Financial Incentive Is Both Procedurally Improper and Unsupported by the Record**

   In his opposition briefing, Mr. Plantan proffers yet another inference of malice in that "[t]he Cornerstone [D]efendants maintain a financial incentive to advance their theory that their methods of assisted communication are a legitimate means of therapy for S.P. and do not constitute 'facilitated communication.'" (ECF No. 85, at 3.)  This purported inference, raised for the first time in his brief in opposition to the Cornerstone Defendants' Motion for Summary Judgment, is both procedurally improper and completely unsupported by the record.

      **i.**  **It Is Procedurally Improper to Raise a New Argument in a Reply Brief**

   First, "a plaintiff cannot assert new claims or attempt to amend his Complaint by raising new allegations and facts in his brief in opposition to a defendant's motion[] for summary judgment." *Lamar v. Ebert*, No. 2:12cv706 (HCM), 2018 WL 11463829, at \*4 (E.D. Va. Mar. 20, 2018) (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) (holding that a complaint cannot be amended by a brief in opposition to a motion for summary judgment)); *Burns v. Clarke*, No. 1:17cv683 (LG), 2018 WL 3999710 (E.D. Va. Aug. 20, 2018); *Butts v. Ofogh*, No. 2:09cv140 (JBF), 2010 WL 8961435 (E.D. Va. Mar. 1, 2010)).

      **ii.**  **The Record Does Not Support a Purported Inference of Financial Incentive**

   Second, Ms. Atkinson's sworn deposition testimony rebuts this proffered inference. When asked whether she was trying to work on developing S.P.'s typing skills back in December of 2020, Ms. Atkinson explains:

> *That's a very minimal part of what we do.* I'm working with her on learning to brush her hair, doing her tooth brushing, doing her sensory skills, understanding she is a bright young lady, so teaching her about how the sensory system works. She has a huge interest in science, so, scientifically, teaching her the things she's interested in and then having her respond through her typing if it requires a response.

(Atkinson Depo. Tr., at 45:11–21 (emphasis added).) Later, she reiterates:

> [M]y job as an [occupational therapist] is to look at the motor skills, not what she types, not the cognitive piece of what she types. *Is it amazing to me what she can type sometimes? Absolutely. But is that part of what I'm doing as a therapist? No. What I'm doing as a therapist is improving her motor skills.* My goal is to get her independent in typing.

(Atkinson Depo. Tr., at 87:20–88:1 (emphasis added); *see also* Atkinson Decl. ¶ 17; Smith Depo. Tr., at 115:18–116:4.) The uncontradicted record establishes that typing to communicate is "a very minimal part" of what Ms. Atkinson does with S.P. and that the particular content S.P. types "is [not] part of what [Ms. Atkinson is] doing as a therapist." (Atkinson Depo. Tr., at 45:14, 87:23–24.) Mr. Plantan is not entitled to an inference of malice due to financial incentive on the part of the Cornerstone Defendants to "advance their theory that their methods of assisted communication are a legitimate means of therapy for S.P.", (ECF No. 85, at 3), because that naked inference is unreasonable in the face of competing inferences in the record.

The Court acknowledges that malice between the parties may exist *now*. Years of contentious litigation over the sensitive subject at bar will inevitably engender malice even where none existed before. However, Mr. Plantan has adduced no evidence of any malice prior to the allegations from which this case springs.

Elements one and two—1) malice . . . 2) instituted by or with the cooperation of the defendant—are the only elements contested in the malicious prosecution claim against the Cornerstone Defendants (Count III).[26]

Because, even viewing the record as a whole and in the light most favorable to Mr. Plantan, Mr. Plantan has not presented a genuine dispute of a material fact regarding either malice or the Cornerstone Defendants' institution of or cooperation in the prosecution of Mr. Plantan, the Court will grant the Cornerstone Motion for Summary Judgment and will dismiss the malicious prosecution claim (Count III) against the Cornerstone Defendants.  (ECF No. 79.)

**B.      As a Matter of Law, Mr. Plantan Fails to State a Claim for Malicious Prosecution Against Ms. Smith (Count III)**

As previously stated, a claim for malicious prosecution under Virginia law requires that the plaintiff prove that "the prosecution was (1) malicious, (2) instituted by or with the cooperation of the defendant, (3) without probable cause, and (4) terminated in a manner not unfavorable to the plaintiff." *Bennett*, 492 F. App'x at 316 (quoting *Reilly*, 643 S.E.2d at 218).

Ms. Smith "does not contest that the prosecution of Mr. Plantan was initiated with her cooperation or that it terminated in a manner not unfavorable to Mr. Plantan." (ECF No. 78, at 15.) *See Bennett*, 492 F. App'x at 316.  Thus, the only disputed elements are (1) whether the prosecution was malicious and (3) whether it lacked probable cause.

---

[26] Even were the Court to address the remaining two elements, the outcome would not change. *See Bennett*, 492 F. App'x at 316.  As to the third element—whether probable cause existed—Mr. Plantan has not created a genuine dispute over whether the Cornerstone Defendants instituted or cooperated in the prosecution at all, much less whether they did so without probable cause.  Regarding the fourth element—whether the prosecution ended favorably to Mr. Plantan—no party disputes that it did.  But this favorable outcome does not negate his failure to establish any of the first three elements of malicious prosecution as articulated in *Bennett*. *See* 492 F. App'x at 316.

The Court addresses probable cause first because it is dispositive.  Under the standard the Court must apply at summary judgment, Ms. Smith has established probable cause as a matter of law because she followed advice of counsel—Ms. Podboy, who served as S.P.'s guardian *ad litem*—in reporting the typed allegations to law enforcement.  Even viewing the record as a whole and in the light most favorable to Mr. Plantan, Mr. Plantan has adduced no evidence to create a genuine dispute about whether Ms. Smith in good faith consulted a competent, reputable attorney admitted to practice in Virginia, honestly recounted all of the material facts, and then followed that counsel's advice in reporting the allegations to law enforcement.  Justified reliance on the advice of counsel establishes probable cause, and probable cause is a complete defense to malicious prosecution.  *See Andrews*, 585 S.E.2d at 786 (quoting *Pallas*, 250 S.E.2d at 359–60) (internal quotation marks and citations omitted).

Even were the Court to find that a genuine dispute of material fact as to probable cause existed, the proffered evidence does not create a genuine dispute of material fact as to malice.

Because Ms. Smith has established the existence of probable cause and, in the alternative, an absence of a genuine dispute of a material fact concerning malice, the Court will grant Ms. Smith's Motion for Summary Judgment as to the malicious prosecution claim (Count III).  (ECF No. 77.)

### 1.    Ms. Smith Has Established Probable Cause as a Matter of Law Due to Fulsome and Good-Faith Consultation with S.P.'s Guardian *Ad Litem*

Ms. Smith argues that her "justified reliance on the advice of counsel establishes probable cause to support the prosecution of Mr. Plantan."  (ECF No. 78, at 20.)  Mr. Plantan counters that because Ms. Podboy is not Ms. Smith's lawyer, but rather S.P.'s guardian *ad litem*, Ms. Smith

cannot claim advice of counsel. (ECF No. 84, at 4.)[27] Mr. Plantan cites no authority for this contention in his briefing and offered none upon questioning at oral argument. (*See generally* ECF No. 84.)

Virginia case law supports Ms. Smith's proposition. In *Closgard Wardrobe Co. v. Normandy*, the Supreme Court of Appeals of Virginia considered whether a defendant who had acted upon the advice of a member of the bar of another jurisdiction had established an advice-of-counsel defense to a claim of malicious prosecution. 163 S.E. 355, 356–57 (Va. 1932). The *Closgard* court noted that, in the context of the advice-of-counsel defense to a malicious prosecution claim, "no limitation is placed on the word 'counsel'" and "[t]he language employed . . . indicates the employment of the word 'counsel' in its broadest sense." *Id.* at 357. The *Closgard* court concluded that "if counsel is competent, reputable, and has been regularly admitted to practice law in any State of this Union, then he [or she] is qualified, after hearing a full disclosure of the facts, to give advice upon which a criminal warrant may be issued." *Id.* at 358.

Here, even viewing the record as a whole and in the light most favorable to Mr. Plantan, the uncontradicted evidence establishes the advice-of-counsel defense as a matter of law. First, the evidence demonstrates that Ms. Podboy was a licensed attorney and that she was previously aware of both the nature and extent of S.P.'s disabilities and the method of typing used with S.P. (Smith Aff. ¶ 70; Podboy Aff. ¶¶ 7–9.) The evidence unequivocally states that Ms. Smith sought Ms. Podboy's advice after learning of the allegations, and that she disclosed all material facts in

---

[27] Specifically, Mr. Plantan claims that "[Ms.] Smith argues that she is immune from suit due to the advice of counsel." (ECF No. 84, at 4.) This misstates Ms. Smith's argument. Ms. Smith does not argue that she is immune from suit, but rather that her "justified reliance on the advice of counsel establishes probable cause to support the prosecution" and thus defeats the malicious prosecution claim as a matter of law. (*See* ECF No. 78, at 20.)

so doing. (Smith Aff. ¶¶ 71–72; Podboy Aff. ¶¶ 6–7.) It is undisputed that Ms. Podboy first

discussed the allegations with someone in the Commonwealth's Attorney's office, and then

advised Ms. Smith to call the non-emergency number for the Hanover County Sheriff's

Department. (Smith Aff. ¶ 71; Podboy Aff. ¶¶ 10–12.) The uncontradicted evidence establishes

that Ms. Smith waited to hear back from Ms. Podboy, and that she subsequently followed Ms.

Podboy's advice exactly. (Smith Aff. ¶¶ 73; Podboy Aff. ¶ 12 (stating that Ms. Podboy advised

Ms. Smith "to call the non-emergency telephone number for the Hanover County Sheriff's

Department and report what had occurred").)

It is immaterial that Ms. Podboy was not Ms. Smith's counsel. Nothing in Virginia law

requires that the consulted lawyer be retained to establish an advice-of-counsel defense. Indeed,

*Closgard* instructs that so long as "counsel is competent, reputable, and has been regularly

admitted to practice law in any State of this Union, then he [or she] is qualified, after hearing a

full disclosure of the facts, to give advice upon which a criminal warrant may be issued." *See*

163 S.E. at 358; *see also Khoraki v. Longoria*, No. 3:22-cv-70 (REP), 2023 WL 2603379, at *12

(E.D. Va. Mar. 22, 2023) (rejecting advice-of-counsel defense raised by defendant investigator

due to consultation with Commonwealth's Attorney because investigator failed to disclose all

material facts, but taking no issue with fact that Commonwealth's Attorney was not the

investigator's attorney). In this case, Ms. Peabody was not just *any* competent counsel but rather

was S.P.'s guardian *ad litem*, meaning Ms. Podboy's professional duty was to protect S.P. rather

than to represent Ms. Smith. This fact countermands even further any inference Mr. Plantan

would ask the Court to draw that the consultation with Ms. Peabody did not constitute

appropriate advice of counsel.[28]  Thus, the Court concludes that because Ms. Smith consulted competent, reputable counsel admitted to practice in Virginia, and did so in good faith and with full disclosure of all relevant facts, Ms. Smith's justified reliance on the advice of counsel constituted probable cause to support the initiation of the prosecution of Mr. Plantan as a matter of law.

### 2.  Mr. Plantan's Alternative Bases for Genuine Dispute of Material Fact as to Probable Cause Also Fail

Even had Ms. Smith not established a valid advice-of-counsel defense through her consultation with S.P.'s guardian *ad litem*, Mr. Plantan's alternative proffers of genuine disputes of material fact founder.  Mr. Plantan offers many of the same facts and inferences as to probable cause that he argues under malice.  (*Compare* ECF No. 84, at 2–4 (malice) *with* ECF No. 84, at 4 (probable cause).)  This is appropriate because "a jury may infer malice from a lack of probable cause, thus evidence showing lack of probable cause is always admissible to prove malice." (ECF No. 84, at 3 (citing *Reilly*, 643 S.E.2d at 218; *Freezer v. Miller*, 176 S.E. 159, 168–69 (Va. 1934)).)  Accordingly, the Court construes these arguments as speaking to the lack of probable cause element and addresses them here.

### a.  The School's Definitive Rejection of S.P.'s Typing Came *After* Ms. Smith Reported the Allegations

First, although Mr. Plantan argues that Ms. Smith should have known better because of the school's rejection of S.P.'s typing, he misconstrues the timeline of when the school informed Ms. Smith that they did not believe the typed words were S.P.'s words.  The school's rejection,

---

[28] Mr. Plantan's brief states that any representation of Ms. Smith by Ms. Podboy "would have been in conflict of interests."  (ECF No. 84, at 4.)  It is unclear what Mr. Plantan suggests this means because Ms. Smith does not claim that she hired Ms. Podboy to represent her. Rather, she disclosed pertinent facts to an attorney responsible for protecting S.P.'s interests and followed the instructions she received exactly.

published April 1, 2021, came *after* Ms. Smith had reported the allegations to law enforcement on December 15, 2020, so it cannot establish what she should have known in December.

The record reflects that on October 27, 2020, Ms. Atkinson wrote a letter to S.P.'s IEP team in which she detailed the keyboarding work that she had undertaken with S.P. and in which she averred that she "underst[oo]d the 'bad rap' facilitated communication has and d[id] not wish to be a part of that." (ECF No. 75-3, at 2.) On December 4, 2020, S.P.'s IEP team, including Ms. Smith, met to review S.P.'s progress, and that on December 14, 2020, Ms. Smith received a draft IEP via email. (Smith Aff. ¶¶ 81–82.) However, the undisputed record also establishes that Ms. Smith did not review the email until January 8, 2021. (Smith Aff. ¶ 83 & Attachment No. 5.)[29] On January 19, 2024, when Ms. Smith submitted her comments on the draft IEP, she disputed the factual accuracy of the draft's characterization of S.P.'s typing as facilitated communication, because the report stated that S.P. used hand-over-hand typing when in fact she received minimal wrist support. (Smith Aff. ¶ 84.) Then, on February 16, 2021, S.P.'s lead Special Education teacher forwarded an email to S.P.'s IEP team, including Ms. Smith, that referenced the American Speech-Language-Hearing Association's opinion statement that "Facilitated Communication (FC) is a discredited technique that should not be used." (Smith Aff. ¶ 85 & Attachment No. 7.)

This timeline could suggest that Ms. Smith was on notice that the school was going to decline to recognize the assisted typing as S.P.'s own words as early as the fall of 2020. Even

---

[29] As explanation for the delay in reviewing the draft IEP, Ms. Smith states that S.P. "decompensated" in the days following December 15, 2020, with episodes of physical aggression, agitation, emotion dysregulation, sleep disturbances, and OCD behaviors. This decompensation resulted first in treatment at the Chippenham Hospital Pediatric Emergency Room, which proved unsuccessful, and ultimately in admission to the Commonwealth Center for Children & Adolescents under a Temporary Detention Order for three days from December 21, 2020, to December 24, 2020. (Smith Aff. ¶¶ 78–80.)

then, however, the evidence shows that as of January 2021 Ms. Smith still sought to correct the

school's understanding of *how* S.P. types—namely, with minimal wrist support rather than hand-

over-hand. (*See* Smith Depo. Tr., at 121:7–122:23 (contesting the school's characterization of

the typing as facilitated communication).) Thus, even viewing the record as a whole and in the

light most favorable to Mr. Plantan, the inference that Mr. Plantan asks the Court to draw—that

Ms. Smith should have known in advance that the typing was discredited—is unreasonable in the

face of the contemporaneous record-backed contrary evidence that Ms. Smith genuinely believed

the school misunderstood the mechanics of S.P.'s typing method.

Further, the school's conclusive rejection of S.P.'s typed communications did not occur

until the "Speech/Language Update March 2021" in S.P.'s amended IEP issued on April 1, 2021.

(ECF No. 78-2, at 90–92, 118.)  The relevant portion of the April 1, 2021 IEP reads:

> Based on the communication observations and home visits, the communication
> method utilized by the parent and private home help of adult supported, hand
> under hand typing is identical to the unsupported communication method of
> Facilitated Communication (FC).  The description of facilitated communication is
> "a technique that involves a person with a disability pointing to letters, pictures,
> or objects on a keyboard or on a communication board, typically with physical
> support from a "facilitator."  This physical support usually occurs on the hand,
> wrist, elbow, or shoulder (Biklen, Winston Morton, Gold, Berrigan, &
> Swaminathan, 1992) or on other parts of the body."  Facilitated communication is
> also referred to as "Assisted Typing," "Facilitated Communication Training," and
> "Supported Typing."  (Lilienfild, Marshall, Todd, & Shane, 2014).

> This form of communication has not been scientifically supported and without
> evidence of valid, authentic, and independent communication, the team must call
> into question the authorship of the messages being produced.  Additionally,
> continued use of this method impairs the ability of trained and license speech-
> language pathologists to implement effective and appropriate communication
> options that offer a means of independent expression to the individual.

(ECF No. 78-2, at 92.)

Moreover, the school's March/April 2021 rejection of S.P.'s typing must be placed in

broader context.  In 2018, when S.P. was in the fifth grade, she worked with her teachers at

Kersey Creek Elementary School in Hanover County to use a keyboard to spell words. (Smith

Aff. ¶ 36.) In September of 2020, the school's speech therapist Lauren Whitlock suggested the

use of an iPad for keyboarding, and the school provided one. (ECF No. 80, at 9.) In fact, S.P.

previously had "typed a poem for school and won a national award for the county school, and

they put her typing poem into the state and the national [competition] and she won." (Atkinson

Depo. Tr., at 86:10–13.) The school's prior unquestioning approval of S.P.'s typing indicates

that the doubts that arose by the spring of 2021 were novel in the context of the broader history

of S.P.'s typing development. Mr. Plantan has offered no evidence of any reason Ms. Smith

should have doubted S.P.'s typed words prior to December 15, 2020.

At summary judgment, the Court must consider the reasonableness of any inference

derived from the amended IEP in the context of additional competing inferences to the contrary.

*See Sylvia Dev. Corp.*, 48 F.3d at 818. Although the school rejected S.P.'s assisted typing in

April 2021, during that same month, on April 4, 2021, the Hanover Juvenile & Domestic

Relations District Court found, following a hearing on the issue, that S.P. was competent to

testify as a witness and that the use of physically-aided communication in the prosecution of Mr.

Plantan was "proper, appropriate, reliable and credible." (ECF No. 75-4, at 2.) Both of these

developments are of limited import because they both occurred *after* Ms. Smith made the

decision to report Mr. Plantan to law enforcement. To the extent that the school's rejection of

S.P.'s typing would suggest that Ms. Smith should not have believed that the typed words were

her daughter's words, the nearly simultaneous conclusion of the Hanover JDR court that such

methods were "proper, appropriate, reliable and credible", (ECF No. 75-4, at 2), suggests that the

potential illegitimacy of these communications was far from conclusive at the time Ms. Smith

initiated the prosecution of Mr. Plantan and present a competing inference regarding the

reasonableness of Ms. Smith's belief that S.P. authored the typed communications. *See Sylvia Dev. Corp.*, 48 F.3d at 818.

      **b.**    **Prior Suspicion or Corroborating Evidence Are Not Necessary Where a Victim Identifies a Suspect**

Second, Mr. Plantan argues that the lack of any prior reason to suspect the conduct alleged, combined with the lack of corroborative evidence and S.P.'s lack of formal sexual education, suffices to establish that Ms. Smith lacked probable cause. (ECF No. 84, at 3.) Not so. The United States Court of Appeals for the Fourth Circuit has confirmed that a victim's identification of a suspect suffices to support an arrest warrant and that "[i]f there was 'sufficient evidence for an arrest warrant to be issued' . . . then by definition there was probable cause." *McKinney v. Richland Cty. Sheriff's Dept*, 431 F.3d 415, 418 n.3 (4th Cir. 2005) (citing U.S. CONST. am. IV (providing that "no Warrants shall issue, but upon probable cause")); *see also Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991) ("It is surely reasonable for a police officer to base his [or her] belief in probable cause on a victim's reliable identification of his [or her] attacker. Indeed, it is difficult to imagine how a police officer could obtain better evidence of probable cause than an identification by name of assailants provided by a victim, unless, perchance, the officer were to witness the crime himself [or herself].") (internal citation omitted). The uncontradicted evidence in the record establishes that Ms. Smith believed "100 percent" that the typed words were S.P.'s words. (Smith Depo. Tr., at 124:3–6.)

Thus, even without prior reason to suspect the conduct alleged, S.P.'s identification of her assailant suffices to provide "probable cause" for Ms. Smith to report the allegations to law enforcement.[30] *See McKinney*, 431 F.3d at 418; *Torchinsky*, 942 F.2d at 262. Physical or other

---

[30] The Court notes that Ms. Smith reported the accusations to the *non-emergency* line of the Hanover County Sheriff's Department. (Smith Aff. ¶ 73; Smith Depo. Tr., at 47:8–15.)

corroborating evidence is not necessary, as a matter of law, to establish probable cause for reporting S.P.'s allegations to law enforcement. *See McKinney*, 431 F.3d at 418; *Torchinsky*, 942 F.2d at 262.

      **c.**      **The Other Actors Who Advanced the Prosecution Create a Competing Inference of Probable Cause**

Finally, although it separately establishes probable cause outright, Ms. Smith's consultation with S.P.'s guardian *ad litem* prior to reporting the allegations to non-emergency law enforcement also provides a competing inference that a lawyer who knew S.P.'s abilities and method of typing also found the allegations worth taking seriously. Indeed, a chain of six largely impartial actors found probable cause to pursue the prosecution flowing from the typed allegations: (1) S.P.'s guardian *ad litem*; (2) the Hanover County Sheriff's Department; (3) the magistrate who issued the arrest warrant; (4) the Commonwealth's Attorney; (5) the grand jury that indicted Mr. Plantan; and, (6) the Hanover Juvenile and Domestic Relations Court judge who presided over S.P.'s competency hearings during Mr. Plantan's criminal proceedings. Certainly, this string of events bolsters the reasonableness of any determination by Ms. Smith that she had a proper basis to report the typed words. While these subsequent actors' affirmations are not dispositive of the issue of probable cause, they provide a competing inference as to the reasonableness of Ms. Smith's belief in the typed communications' legitimacy, particularly because many of these actors had either the same material information Ms. Smith had, or they conducted their own inquiry into the legitimacy of S.P.'s typed communications. *See Westreich v. McFarland*, 429 F.2d 947, 949 (4th Cir. 1970) (although "Virginia has not expressly held that an indictment furnishes prima facie evidence of probable cause . . . [,] the fact that the plaintiff was indicted is, nevertheless, pertinent evidence tending to show probable cause"). At summary judgment, Mr. Plantan is not entitled to his suggested

inference of a lack of probable cause in the face of other directly contradictory inferences on the same question that are supported by evidence in the record. *See Sylvia Dev. Corp.*, 48 F.3d at 818.

Thus, although Ms. Smith has established probable cause as a matter of law because—even viewing the record as a whole and in the light most favorable to Mr. Plantan—the uncontradicted evidence in the record shows that she relied on the advice of competent and reliable counsel in reporting the allegations to law enforcement after an honest and full disclosure of all relevant facts, Mr. Plantan's arguments that the record separately establishes any dispute as to probable cause cannot be maintained.

### 3. Mr. Plantan Has Failed to Identify Evidence that Creates a Genuine Dispute of a Material Fact with Respect to Malice

Separately, Ms. Smith argues that Mr. Plantan has identified no evidence to support his allegation that she acted with malice towards him, and that "[i]n fact, Mr. Plantan has conceded that he does not know of any facts or evidence to show that [Ms.] Smith reported S.P.'s allegations against him in an effort to cause him some harm." (ECF No. 78, at 16 (citing ECF No. 78-7, at 2 ("Plantan Depo. Tr. Excerpt 2"), at 83:17–25).)

In lieu of identifying evidence, Mr. Plantan argues that numerous inferences of malice arise from the facts of the case. (ECF No. 84, at 2–4.) None of his proffered inferences persuade, and the record forecloses many others.[31]

---

[31] The Court has addressed Mr. Plantan's arguments for an inference of malice due to a lack of probable cause in Part III.B.2, *supra*. The Court does not repeat that analysis here but does address Mr. Plantan's proffered inferences of malice that do not stem from a lack of probable cause.

### a.   Divorce Alone Does Not Support an Inference of Malice

First, the Court rejects Mr. Plantan's assertion that a reasonable inference of malice is apparent from their divorce alone. (ECF No. 84, at 2.) Mr. Plantan cannot establish malice on the fact of the parties' divorce. At oral argument, Mr. Plantan's counsel appeared to concede as much, stating that although the divorce was not "the driving factor" for a malice inference, it was still relevant. But the Court rejects an inference of malice on the part Ms. Smith because she and Mr. Plantan divorced. No evidence prior to the allegations at the core of this case indicates that this divorce was different from the majority of divorces. Indeed, Ms. Smith presents evidence to the contrary. It appears that, although Ms. Smith and Mr. Plantan contested some custody and visitation issues, others were sometimes negotiated. (*See* Smith Aff. ¶ 17 (stating that in 2012, Mr. Plantan began exercising overnight visitation with S.P. "by the agreement"); Smith Depo. Tr., at 108:11–24 (describing the visitation arrangement as "unofficial[]" and "whatever we agreed to").) And even after Mr. Plantan left and returned, Ms. Smith and her husband hosted Mr. Plantan on their property from August 2016 to November 2016. (ECF No. 78, at 3; ECF No. 85-2, at 111–112.) Such actions suggest a cordial rather than rancorous divorce. Mr. Plantan has not identified competing evidence that their divorce gave rise to animus, as is required at summary judgment.

### b.   The Litigation in Juvenile and Domestic Relations Court Does Not Support an Inference of Malice

Second, Mr. Plantan argues that a reasonable inference of malice exists "from the nature of their litigation in Hanover County Juvenile and Domestic Relations Court." (ECF No. 84, at 2.) It is unclear what Mr. Plantan would have the Court understand to be the nature of that litigation. He has not put forth any affirmative evidence about it. In contrast, Ms. Smith has presented evidence that she and Mr. Plantan cooperated to amend their custody agreement

multiple times, including at times to expand his visitation rights, that Mr. Plantan had more visitation than he elected to exercise for a number of years, and that the curtailment in his visitation in April 2019 came at the recommendation of the guardian *ad litem*, not Ms. Smith herself. (ECF No. 78, at 2, 4; Smith Depo Tr., at 93:4–22.) Mr. Plantan offers no evidence in rebuttal.

### c. Ms. Smith's Willingness to Drop the Criminal Charges if Mr. Plantan Ceded Visitation Is Insufficient to Establish a Triable Inference of Malice

Mr. Plantan next asserts that "the fact that [Ms.] Smith had her attorney contact Mr. Plantan's attorney and leverage her willingness to advance his criminal proceedings as a means of having him drop his claims for visitation with S.P. is enough to give a jury a triable inference of malice." (ECF No. 84, at 2.)  This misstates the record, which provides in relevant part:

> Q:  To your knowledge did you have counsel communicate with a representative of Mr. Plantan that you would see to it or at least take efforts to see to it that his criminal charges would be dropped should he agree to forego future custody and visitation of [S.P.]?
>
> A:  Okay, yes, yes.
>
> Q:  Okay.  Did you instruct them to have that conversation?
>
> A:  I did not.
>
> Q:  Did you tell the Commonwealth's attorney that you would take any steps to agree to see to it or not object to the dropping of his criminal charges if he were to acquiesce to the no custody and no visitation?
>
> A:  I contacted M[a]cKenzie [Babichenko, the Assistant Commonwealth's Attorney who prosecuted Mr. Plantan] to tell her that a friend of the family was an attorney and was suggesting this, and which I wanted to be sure we didn't step on any toes and said would that be okay.  And she said that is fine, I don't see it being a problem.  That was like the extent of my conversation.  I remember it was very short.

(Smith Depo. Tr., at 91:8–92:1.)

Under the standard the Court must apply for summary judgment purposes, this exchange does not suffice to establish a triable inference of malice. For one, in context it appears that Ms. Smith was asking the Assistant Commonwealth's Attorney, Ms. Babichenko, about this possibility, rather than "ha[ving] her attorney contact Mr. Plantan's attorney and leverage her willingness to advance his criminal proceedings as a means of having him drop his claims for visitation with S.P." (*See* ECF No. 84, at 2.) Ms. Smith clarifies that she "did not" instruct her attorney to have that conversation with Mr. Plantan's counsel, and it appears from her sworn deposition testimony that the lawyer was a "friend of the family" who may or may not have been retained by Ms. Smith. (Smith Depo. Tr., at 91:14–16.) Further, this exchange occurred *after* Ms. Smith initially reported the allegations to law enforcement.

The fact that Ms. Smith was later willing to drop the charges if Mr. Plantan would agree to stay away from S.P. may support an inference of malice, but it also supports a competing inference that Ms. Smith simply did not want Mr. Plantan around S.P. in the wake of the allegations that Ms. Smith took seriously. To credit Mr. Plantan's proffered inference as establishing malice, then, would require the Court to "build[] one inference upon another" and then infer that Ms. Smith did *not* believe the allegations and that she instituted the prosecution with an eye toward extorting Mr. Plantan in their custody dispute. *See Lamar*, 2018 WL 11463829, at *3 (citations omitted). At summary judgment, the nonmoving party must rely on more than "the 'building of one inference upon another.'" *See id.* What's more, these additional inferences are inconsistent with the evidence in the record—which support a finding that Ms. Smith genuinely believed the allegations. These inferences also are dissonant with theories that Mr. Plantan advances elsewhere in this litigation, namely that Ms. Smith genuinely believed the allegations but was wrong to do so. *See Scott*, 550 U.S. at 380 ("When opposing parties tell two

57

different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

### d. The Inadvertent Use of Facilitated Communication Would Not Establish Malice Where Defendants Should Not Have Known They Were Engaged in Facilitated Communication

Fourth and finally, Mr. Plantan argues that Ms. Smith should have known that facilitated communication was invalid. The Court has previously concluded that Mr. Plantan has presented no evidence that would create a genuine despite as to whether, prior to her decision to report on December 15, 2020, Ms. Smith had reason to doubt that S.P. substantively authored the typed communications. *See* Part III.B.2, *supra*.

As observed previously with respect to the Cornerstone Defendants, Ms. Smith may be incorrect in her belief that the typed words are S.P.'s. In determining that Mr. Plantan has not identified sufficient evidence to create a genuine despite as to malice, the Court does not decide whether the typed communications at issue are legitimately authored by S.P. It may be that, despite the assistants' belief that the words are S.P.'s, all three assistants each subliminally directed S.P. to type certain words and thus fabricate the accusations against Mr. Plantan. But *even assuming that were the case*, subliminal, unconscious, inadvertent direction fails to establish malice when the uncontroverted evidence produced in this litigation suggests that Ms. Smith, as well as the Cornerstone Defendants and others working with S.P., *believed these allegations at the time the decision to initiate the prosecution was made*. Ms. Smith has identified evidence of the reasonableness of her belief that these communications were

legitimate, and Mr. Plantan offers nothing in rebuttal but conjecture and proposed inferences.[32] Survival on motion for summary judgment requires more.

In sum, even viewing the record as a whole and in the light most favorable to Mr. Plantan, the uncontradicted record reflects that Ms. Smith relied on the advice of counsel after a full and honest recounting of all known material facts, which establishes probable cause as a matter of law and serves as a complete defense to an action for malicious prosecution. Even had Ms. Smith not conclusively established an advice-of-counsel defense, no evidence exists from which a reasonable jury could find that Ms. Smith lacked probable cause in reporting the allegations to law enforcement after consulting with S.P.'s guardian *ad litem*, and Mr. Plantan's proffered inferences regarding both probable cause and malice, unsupported by evidence and considered in the context of competing inferences that are supported by a robust factual record, are not reasonable. *See Sylvia Dev. Corp.*, 48 F.3d at 818. As with the Cornerstone Defendants, the Court acknowledges that malice between Ms. Smith and Mr. Plantan must presently exist given the years of contentious litigation over this troubling subject. However, that is not a basis on which a fact finder could find that malice existed *prior* to the initiation of litigation, and Mr. Plantan has adduced no evidence of any malice prior to the allegations from which this case springs. Thus, the Court will grant Ms. Smith's Motion for Summary Judgment as to the malicious prosecution claim (Count III).  (ECF No. 77.)

---

[32] Ms. Smith declined to permit S.P. to participate in a double-blind test in Hanover County Juvenile and Domestic Relations Court, and Mr. Plantan failed to seek a double-blind test in the litigation before this Court.  The negative inferences from these two decisions cancel each other out.

### C. Mr. Plantan Does Not State a Claim for Intentional Infliction of Emotional Distress Against Ms. Smith (Count V)

Mr. Plantan also brings a Virginia intentional infliction of emotional distress ("IIED") claim against Ms. Smith (Count V). (ECF No. 1 ¶¶ 113–22.) Even viewing the record as a whole and in the light most favorable to Mr. Plantan, Mr. Plantan has produced no evidence that Ms. Smith's conduct was outrageous and intolerable so as to offend generally accepted standards of decency and morality. Thus, the Court will grant Ms. Smith's Motion for Summary Judgment as to the IIED claim (Count V). (ECF No. 77.)

#### 1. Legal Standard: Intentional Infliction of Emotional Distress

To state a claim for IIED under Virginia law, a plaintiff must plausibly allege: (1) "the wrongdoer's conduct was intentional or reckless"; (2) "the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality"; (3) "there was a causal connection between the wrongdoer's conduct and the emotional distress"; and, (4) "the emotional distress was severe." *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974). Because of the "risks inherent in torts where injury to the mind or emotions is claimed," Virginia law does not favor IIED claims. *Harris v. Kreutzer*, 624 S.E.2d 24, 33 (Va. 2006) (citation omitted); *see also Almy v. Grisham*, 639 S.E.2d 182, 187 (Va. 2007). However, Virginia law does not completely bar IIED claims. *Daniczek*, 156 F. Supp. 3d at 758.

The second element's requirement that the conduct be "outrageous" is a question of law, but "[w]here reasonable [minds] may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Womack*, 210 S.E.2d at 148 (citation omitted).

60

## 2. Mr. Plantan Has Created No Genuine Dispute as to Whether Ms. Smith's Conduct Was Outrageous and Intolerable

Ms. Smith appears to concede, and this Court concludes, that the third and fourth elements of the IIED claim are not in dispute: Ms. Smith's reporting had a "causal connection" to the "emotional distress" experienced by Mr. Plantan during and following his criminal prosecution, and his "emotional distress" was severe. *See Womack*, 210 S.E.2d at 148. Thus, the Court discusses only elements one and two: whether "the wrongdoer's conduct was intentional or reckless", and whether "the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality." *See id.*

Ms. Smith asserts that "[t]here are no facts in this case from which a reasonable person could conclude that [Ms.] Smith acted recklessly in reporting the allegations against Mr. Plantan or that her conduct in doing so was so outrageous and intolerable as to offend generally accepted standards of morality and decency." (ECF No. 78, at 21–22.) Ms. Smith notes that "there existed an objectively reasonable basis for [Ms.] Smith's actions" for all of the reasons that gave Ms. Smith probable cause to report the allegations, as discussed in Part III.B.2, *supra*.

As to the first element, intent or recklessness, Mr. Plantan asserts that "there is evidence that [Ms.] Smith 'intended the specific conduct' of having Mr. Plantan arrested and detained for criminal allegations concerning rape or sexual abuse against their daughter, S.P." (ECF No. 84, at 5.) He further alleges that Ms. Smith "either 'knew or should have known' that emotional distress would inherently . . . result." (ECF No. 84, at 5.) Thus, Mr. Plantan states that the first element "remains justiciable." (ECF No. 84, at 5.) Viewing the record as a whole and in the light most favorable to Mr. Plantan, the Court agrees that there is evidence in the record sufficient to permit a jury to find that Ms. Smith's conduct in reporting the allegations to law enforcement was intentional. (*See, e.g.*, Smith Aff. ¶¶ 73, 75–76.)

As to the second element, whether the conduct was outrageous or intolerable, Mr. Plantan repeats the arguments raised in Part III.B., *supra*.[33] Mr. Plantan maintains that "it is a triable issue of fact as to whether it was outrageous for [Ms.] Smith to advance a criminal complaint against Mr. [Plantan] after a single disclosure via communication that was known to lack creditworthiness and purportedly made by a twelve-year-old child with special needs and without any formal or known sexual education or context absent any reason for prior suspicion or corroborative evidence." (ECF No. 84, at 5.)

Applying the standard it must at summary judgment, the Court rejects these arguments for essentially the same reasons that it rejected them in the context of the malicious prosecution claim. Certainly, if probable cause existed to report the allegations, then such reporting does not constitute outrageous or intolerable conduct. Having concluded that Mr. Plantan has not identified evidence to create a genuine dispute as to whether there was probable cause to report the allegations, the Court necessarily concludes that he has not presented enough evidence to create a genuine dispute as to whether reporting the allegations was "outrageous and intolerable." *See Womack*, 210 S.E.2d at 148.

The undisputed evidence in the record establishes that Ms. Mastrangeli told Ms. Smith that S.P. had typed the allegations, and that Ms. Smith then asked Ms. Mastrangeli to confirm that the typed allegations were true. (Smith Aff. ¶¶ 61–62, 64; Mastrangeli Aff. ¶¶ 16–25.) The uncontradicted record states that Ms. Smith then contacted reputable legal counsel, specifically S.P.'s guardian *ad litem*, and sought advice on how to proceed. (Smith Aff. ¶¶ 70–71; Podboy Aff. ¶ 7.) Mr. Plantan does not dispute that Ms. Smith disclosed all known material facts to Ms.

---

[33] At oral argument, counsel for Mr. Plantan declined to separately argue outrageousness under IIED, noting that there was substantial "overlap" with the arguments raised in the context of the malicious prosecution claim.

Podboy, who was familiar with S.P.'s abilities and method of assisted typing, nor that Ms. Smith then followed Ms. Podboy's advice exactly by reporting S.P.'s allegation to the non-emergency number of the Hanover County Sheriff's Department. (Smith Aff. ¶¶ 71–73; Podboy Aff. ¶¶ 6–9, 12.)

Ms. Smith urges that "[u]nder generally accepted standards of decency and morality, it would have been reckless and irresponsible for [Ms.] Smith or any reasonable parent under the same facts and circumstances *not* to report S.P.'s allegations." (ECF No. 78, at 22 (emphasis added).)  In any event, even viewing the record as a whole and in the light most favorable to Mr. Plantan, the record simply presents no evidence from which a reasonable trier of fact could conclude that Ms. Smith engaged in conduct "so outrageous and intolerable" as to offend "generally accepted standards of decency and morality." *See Womack*, 210 S.E.2d at 148.

### D.     Mr. Plantan Has No Valid Claim for Punitive Damages[34]

"At law, there is no independent, free-standing claim for punitive damages.  Rather, punitive damages are an element of damages available if certain claims are proved." *Costine v. Correct Care Sols., LLC*, No. 2:19-cv-53 (RGD), 2020 WL 809376, at *4 (E.D. Va. Feb. 18, 2020) (quoting *Saleh v. Va. State Univ.*, No. 3:97-cv-460 (REP), 1999 WL 34798179, at *6 n.4 (E.D. Va. Feb. 25, 1999)); *Johnson v. Moore*, No. 3:10-cv-537 (MHL), 2011 WL 1637079, at *11–12 (E.D. Va. Ap. 29, 2011) (dismissing with prejudice punitive damages claim after determining movant was entitled to summary judgment on, *inter alia*, malicious prosecution claim, because there is no independent claim for punitive damages).

---

[34] Mr. Plantan also requests "exemplary damages" in his prayer for relief.  (ECF No. 1, at 28.)  Because punitive damages and exemplary damages are synonymous, *Smith v. Wade*, 461 U.S. 30, 41 (1983), the Court addresses both arguments as one.

Because the Court will dismiss all the remaining claims in this action, the Court will also dismiss the claim for punitive damages because "there is no independent, free-standing claim for punitive damages." *See Costine*, 2020 WL 809376, at *4.

## IV. Conclusion

Even viewing the record as a whole and in the light most favorable to Mr. Plantan, Mr. Plantan has failed to adduce evidence that would create a genuine dispute of a material fact regarding his claim for malicious prosecution against the Cornerstone Defendants (Count III) because he has not put forth evidence that they participated in his prosecution at all, or that, if they did participate, they did so maliciously or without probable cause. The evidence also does not support vicarious liability of the Cornerstone Defendants with respect to any actions of Ms. Mastrangeli or Ms. Whitlow because the uncontradicted record shows that they never worked with S.P. while performing Cornerstone's business or while acting within the scope of their employment with Cornerstone, which would be necessary for a finding of vicarious liability.

Even viewing the record as a whole and in the light most favorable to Mr. Plantan, Mr. Plantan has likewise failed to identify evidence that creates a genuine dispute of a material fact concerning his claim for malicious prosecution against Ms. Smith (Count III) because the uncontradicted record reflects that Ms. Smith relied on advice of counsel after a full and honest disclosure of all known material facts. Such reliance establishes probable cause as a matter of law and serves as a complete defense to an action for malicious prosecution. Even had Ms. Smith not conclusively established an advice-of-counsel defense, there is no evidence that Ms. Smith lacked probable cause in reporting the allegations to law enforcement after consulting with S.P.'s guardian *ad litem*, and Mr. Plantan's proffered inferences regarding both probable cause

64

and malice, unsupported by evidence and considered in the context of competing inferences that are supported by a robust factual record, are not reasonable.

Finally, even viewing the record as a whole and in the light most favorable to Mr. Plantan, Mr. Plantan has failed to evince evidence that would create a genuine dispute of a material fact regarding the claim of IIED against Ms. Smith (Count V) for the same reasons. His failure to raise a genuine dispute as to probable cause for reporting the allegations necessarily means that he has failed to raise a genuine dispute as to the outrageousness or intolerability of the reporting.

While it permeates this case for good reason, the dispute over whether S.P.'s supported typing constitutes facilitated communication was not developed in the record in a manner to render it material. The claims alleged require that Mr. Plantan demonstrate that the defendants acted with malice and lack of probable cause (Count III), or in an outrageous or intolerable manner (Count V). Even viewing the record as a whole and in the light most favorable to Mr. Plantan, he has failed to show even a reasonable inference as to either. Thus, summary judgment in favor of the defendants is appropriate as to all remaining counts. Because Mr. Plantan has not proved these claims, exemplary or punitive damages are also unavailable.

For the foregoing reasons, the Court will grant the Motions for Summary Judgment. (ECF Nos. 77, 79.)

An appropriate Order shall issue.

Date: 06/18/2024
Richmond, Virginia

_____/s/_____
M. Hannah Lauck
United States District Judge